**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

KARIM HUSSEIN AL NASSER, aka
Karim Hussein Al-Nasser, Karim
H. AlNasser, Kram Nseelt, Karim
H. Alaassar,

        *Defendant-Appellant.*

No. 05-10466

D.C. No.
CR-03-01122-NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
April 3, 2006—San Francisco, California

Filed March 20, 2007

Before: Warren J. Ferguson, Stephen S. Trott, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Kleinfeld;
Dissent by Judge Ferguson

3305

**COUNSEL**

James Sun Park, Park Law Office, PLC, Phoenix, Arizona, for the appellant.

Gary M. Restaino, Assistant U. S. Attorney, Phoenix, Arizona, for the appellee.

**OPINION**

KLEINFELD, Circuit Judge:

This case raises issues regarding a vehicle stop and sentencing. We affirm.

## FACTS

A Border Patrol agent was patrolling a stretch of highway running north from the Mexican border in Arizona through an Indian reservation, the Tohono O'odham Nation. He spotted a pickup truck around nine at night that he suspected was carrying illegal aliens, and stopped it. It turned out that there were no illegal aliens in the truck, but there was alcohol, which was illegal on that part of the reservation. The Border Patrol agent called a tribal officer to come over and take charge of the violators. The other Border Patrol agent on the stretch of highway came over too.

Meanwhile, a sedan drove toward the area where the pickup truck and two Border Patrol vehicles were stopped. When the Border Patrol agent shined his flashlight at it so he would be seen, despite the darkness and his dark clothing, he saw people hiding in the back seat (he is six feet nine inches tall, and has a good view down toward the floor when a small sedan passes him and he shines his flashlight in). So the Border Patrol agent told the driver to stop the sedan and directed the driver to pull over with hand gestures. After the sedan stopped, the agent took the keys, and determined that this second stop did indeed produce illegal aliens.

While the three law enforcement vehicles, with two light bars flashing, and the two stopped vehicles were still there, Al Nasser drove up. The tall Border Patrol agent again shined his flashlight so he would be seen and not hit, and again saw people hiding on the floor behind the front seat. He thought this car probably had illegal aliens in it, and said so to his colleague, but chose not to stop it because they already had their hands full. The Border Patrol agents were still busy processing the illegal aliens in the sedan, and the tribal officer was still processing the people with alcohol in the pickup truck.

But Al Nasser stopped anyway. It is understandable that he did, since there were now five vehicles pulled to the side of

the road, two or three with flashing lights, more or less blocking the northbound lane. But no one told him or signaled him to stop. (There is some dispute about this, addressed below.) The Border Patrol agents were just too busy for another carful of illegal aliens and were going to let this one go to avoid the safety problem of having to control so many people.

The Border Patrol agent spoke to Al Nasser in Spanish, assuming he was Mexican, but it turned out that Al Nasser was Iraqi and could not understand Spanish. It also turned out that the people hiding on the floor had paid coyotes in Mexico $1,000 and $1,200 respectively to be smuggled into the United States. After Al-Nasser stopped in the middle of the road, one of the Border Patrol agents came over and took his keys, and the illegal aliens in the car were apprehended.

Al Nasser was convicted of knowingly transporting an illegal alien,[1] but the jury answered "No" to the special interrogatory, "Did defendant transport illegal aliens for the purpose of commercial advantage or private financial gain?" His motion to suppress the fruits of what he claimed was an illegal stop of his car had been denied on the ground that there was no stop.

## Analysis

Al Nasser argues that the evidence from the stop and search of his car (statements made by the illegal aliens) should have been suppressed for lack of reasonable suspicion for the stop, and that his sentence was unreasonable and incorrectly denied him a Guidelines adjustment.

I.   The stop.

For the Border Patrol to need any quantum of suspicion to

---

[1] 8 U.S.C. § 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i).

stop Al Nasser, there would have to be a stop.[2] The district court, after an evidentiary hearing, concluded that the Border Patrol did not stop Al Nasser, but rather that he voluntarily stopped of his own accord. We are bound by the district court's findings of fact unless they are clearly erroneous,[3] and we review *de novo* whether on those facts there was what amounted legally to a stop.[4]

At the evidentiary hearing, the two Border Patrol agents testified that they did nothing to stop Al Nasser. As for why not, the answer was plain:

> A.  As he was passing by, I was thinking, "There goes another load of illegal aliens."
>
> Q.  So why not stop him?
>
> A.  We already had two vehicles stopped there, one with illegal aliens, and I felt that was more than we could safely control at the time.

The tribal police officer was facing the other way, but thought he heard one of the Border Patrol agents holler toward the vehicle to stop. That testimony established an issue of fact as to whether the Border Patrol agents did or did not tell Al Nasser to stop.

What was especially interesting in the suppression hearing on this issue was Al Nasser's testimony. One would think that if his case was that he was stopped illegally, his attorney would have him testify that he stopped because he was told

---

[2]*See Terry v. Ohio*, 392 U.S. 1, 16-17 (1968); *United States v. Judge*, 501 F.2d 1348, 1349 (9th Cir. 1974).

[3]*See United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001); *United States v. Kerr*, 817 F.2d 1384 1386 (9th Cir. 1987).

[4]*See United States v. Stephens,* 206 F.3d 914, 917 (9th Cir. 2000); *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994).

to stop or signaled to stop. But he did not so testify. He was not asked why he stopped, and he did not say why he stopped.

The district court order denying the motion to suppress acknowledges that the defense raised questions about the credibility of the Border Patrol agents' testimony. And the order resolved those questions in favor of the agents. The court found that the officers did not bring about Al Nasser's decision to stop.

**[1]** Al Nasser argues that the district court's finding was clearly erroneous because it was contrary to the tribal officer's testimony. That argument is unpersuasive, because (1) the district court had to choose between the Border Patrol agents' testimony and the tribal officer's testimony, neither being implausible,[5] and (2) one would think Al Nasser, at least, would have testified that he stopped because he was told or signaled to stop, if that were so.

**[2]** Al Nasser also argues that the Border Patrol agents could reasonably expect a motorist to stop regardless of whether they intended or commanded him to. That is not to the point. He may well be right that a reasonable motorist would likely stop or go very slowly if one lane was blocked by five stopped vehicles, two with police lights flashing, but that does not mean that the reasonable motorist would think the police were stopping him. More likely, he would want to assure himself that it was safe to go on instead of speeding past all the stopped vehicles into whatever might have brought it about — perhaps a wreck, dead animal, or injured or dead person in the road.

**[3]** Al Nasser argues that the police should be treated as having stopped someone if they could reasonably anticipate

---

[5]*See United States v. Elliot*, 322 F.3d 710, 714 (9th Cir. 2003) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

that someone would stop, but cites no case that so holds. The Fourth Amendment protects people against "seizures,"[6] which is to say, government action seizing them. We held decades ago, in *United States v. Judge*, that when a driver stops his vehicle voluntarily and the police officer does not order or request him to stop, there is no stop for Fourth Amendment purposes and thus no requirement of any quantum of suspicion.[7] Nothing since has changed this proposition.

[4] The Supreme Court held, in *United States v. Mendenhall,* that "[a] person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained."[8] The Court held, in *Florida v. Bostick*, that even though a passenger on a bus about to depart would not feel free to leave when the police came aboard, that was because he wanted to take the bus, and "says nothing about whether or not the police conduct at issue was coercive."[9] We held, in *United States v. Kerr*, that blocking a vehicle that is backing out of a driveway is a stop,[10] but we held, in *United States v. Kim*, that approaching the driver of an already voluntarily stopped vehicle is not, even where the police partially blocked the car's path of possible movement.[11] And in *United States v. Chan-Jimenez*, when a driver followed by a suspicious policeman pulled over and stopped, we did not treat the driver's voluntary stop as requiring reasonable suspicion.[12] Rather, we concluded that the stop was the policeman's keeping the driver's license and registration and keeping his hand on his gun.[13] We used the active voice regarding the police-

---

[6]*See Terry v. Ohio*, 392 U.S. 1, 16-17 (1968).

[7]*United States v. Judge*, 501 F.2d 1348, 1349 (9th Cir. 1974).

[8]*United States v. Mendenhall*, 446 U.S. 544, 553 (1980).

[9]*Florida v. Bostick*, 501 U.S. 429, 437 (1991).

[10]*United States v. Kerr*, 817 F.2d 1384 1386-87 (9th Cir. 1987).

[11]*United States v. Kim*, 25 F.3d 1426, 1428, 1430-31 (9th Cir. 1994).

[12]*See United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997).

[13]*See id.* ("We find that Chan-Jimenez was seized within the meaning of the Fourth Amendment *when* Officer Price obtained and failed to return his driver's license and registration, and proceeded with an investigation.") (emphasis added).

man's conduct, holding not that a stop occurred when a reasonable driver would feel that he ought to stop, but rather "when a law enforcement officer, by means of physical force or a show of authority, in some way restrains the liberty of a citizen."[14] That is consistent with *Bostick*, which focuses on whether the police conduct was coercive.[15]

**[5]** The Border Patrol officers did not restrain or try to restrain Al Nasser's liberty. He stopped despite their decision to let him pass because their hands were full. Like the bus rider in *Bostick*, Al Nasser's freedom of movement may have been restrained, but was not restrained by police efforts to restrain it. The district court correctly denied the motion to suppress because there was no stop for purposes of Fourth Amendment analysis.

II.   Sentencing.

We review the district court's interpretation of the Sentencing Guidelines de novo and its factual findings for clear error.[16] And we review the ultimate sentence for "reasonableness."[17]

Al Nasser sought a three level downward adjustment in his guideline calculation, because the jury had answered "No" to the interrogatory asking whether he transported the illegal aliens in his car "for the purpose of commercial advantage or private financial gain." The district court denied him the adjustment, despite the absence of evidence that he received any money, because the evidence showed that the aliens had paid $1,000 and $1,200 respectively to a coyote for the transportation. The court found that "this was not an unwise, generous picking up of hitchhikers[,]" that Al Nasser "knew it was an organized activity involving commercial — commer-

---

[14]*Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

[15]*Florida v. Bostick*, 501 U.S. 429, 434-35 (1991).

[16]*United States v. Kimbrew*, 406 F.3d 1149, 1151-52 (9th Cir. 2005).

[17]*United States v. Booker*, 543 U.S. 220, 261-62 (2005).

cial is the wrong word — financial gain[,]" and that Al Nasser's account of how he happened to be there with the illegal aliens was "not worthy of belief."

**[6]** The Guidelines provide for a three level downward adjustment if the "offense was committed other than for profit, or the offense involved the . . . transporting only of the defendant's spouse or child . . . ."[18] The relevant Application Note says that the nonprofit phrase in the Guideline means "there was no payment or expectation of payment for the smuggling, transporting or harboring . . . ."[19] The Guideline formerly provided the adjustment where "the defendant committed the offense other than for profit," but it was amended in 1997 to say "the offense was committed other than for profit" in order "to narrow somewhat the class of cases that would qualify for the reduced offense level."[20]

---

[18]United States Sentencing Guideline § 2L1.1(b)(1) provides: "If (A) the offense was committed other than for profit, or the offense involved the smuggling, transporting, or harboring only of the defendant's spouse or child (or both the defendant's spouse and child), and (B) the base offense level is determined under subsection (a)(2), decrease by 3 levels." U.S.S.G. § 2L1.1(b)(1) (2003).

[19]Application Note 1 of § 2L1.1(b)(1) provides, in pertinent part: "For purposes of this guideline - 'The offense was committed other than for profit' means that there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens." U.S.S.G. § 2L1.1(b)(1), Application Note 1 (2003).

[20]United States Sentencing Guideline Amendment 561 provides: "Section 2L1.1 is repromulgated with the following changes:

Section 2L1.1(b)(1)(A) is amended by deleting 'the defendant committed the offense' and inserting in lieu thereof 'the offense was committed'.

The Commentary to § 2L1.1 captioned "Application Notes" is amended in Note 1 by deleting:

" 'The defendant committed the offense other than for profit' means that there was no expectation of payment for the smuggling transportation or harboring of any of the unlawful aliens. The 'number of unlawful aliens smuggled transported or harbored' does not include the defendant."

**[7]** The offense was committed October 5, 2003, long after the narrower guideline went into effect. Under the 2003 guidelines applicable at sentencing, it did not matter whether Al Nasser got paid, or even expected payment, because the court did not find that the crime was committed other than for profit. Al Nasser was part of a scheme to transport the aliens for money, whether he personally received any of the money or not. An "offense was committed other than for profit" only if the offense itself was committed other than for profit, regardless of whether the particular defendant got or expected to get any of the money.

**[8]** The district court took account of *United States v. Booker*,[21] and although we had not yet issued our en banc

and inserting in lieu thereof:

> " 'The offense was committed other than for profit' means that there was no expectation of payment for the smuggling transportation or harboring of any of the unlawful aliens.
>
> 'Number of unlawful aliens smuggled transported or harbored' does not include the defendant."

Section 5K2.0 is amended in the third paragraph by deleting 'immigration violations' and inserting in lieu thereof 'other guidelines'; and by deleting 'for an immigration violation' and inserting in lieu thereof 'under one of these other guidelines'.

**Reason for Amendment:** This amendment implements section 203 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009, which directs the Commission to amend the guidelines for offenses related to smuggling, transporting, or harboring illegal aliens. Pursuant to the emergency amendment authority of that Act, this amendment previously was promulgated as a temporary measure effective May 1, 1997. This version of the amendment changes § 2L1.1(b)(1)(A)(pertaining to a reduction for non-profit offenses) to narrow somewhat the class of cases that would qualify for the reduced offense level under that provision. This amendment also makes a conforming change to § 5K2.0.

[21]*United States v. Booker*, 543 U.S. 220 (2005).

decision in *Ameline*,²² the district court anticipated it by expressly considering the reasonableness of the sentence in light of all the factors in 18 U.S.C. § 3553 and expressly acknowledging that the court was not bound by the guidelines. Al Nasser argues that the fifteen month sentence was unreasonable because he was going to remain law abiding subsequently and the judge did not consider the immigration consequences. But the judge expressly did consider the immigration consequences and decided not to reduce the sentence further, despite whatever those consequences might be. There is no basis for characterizing the judge's exercise of sentencing discretion, or the sentence itself, as unreasonably harsh.

**AFFIRMED**.

---

FERGUSON, Circuit Judge, dissenting:

I agree with the majority concerning the general rule that a "person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained," maj. op. at 3313 (quoting *United States v. Mendall*, 446 U.S. 544, 553 (1980)); *see also Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968), but I disagree with its decision that Al Nasser's movement was not so restrained. "[T]aking into account all of the circumstances surrounding the encounter" in this case, "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)) (internal punctuation omitted). The majority's conclusion to the contrary is illogical and contravenes both Supreme Court and Ninth Circuit precedent.

---

²²*United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc).

## I.

On the night of October 4, 2003, uniformed Border Patrol Agents Cortright and Spivey were patrolling a stretch of Federal Route 15 ("Route 15"), a two-lane highway that runs through Arizona and the Tohono O'odham Nation. That evening, Agents Cortright and Spivey, along with Police Officer Lopez, pulled over two vehicles on suspicion of transporting undocumented immigrants. While questioning and arresting the occupants, the officers blocked traffic on the northbound lane of Route 15.

Driving north on this stretch of highway, Karim Hussein Al Nasser ("Al Nasser") drove up to the arrest scene. Three marked police cars were in the road, at least two with activated flashing lights. The two stopped civilian vehicles were also detained and blocking traffic, and their occupants were being arrested. Uniformed Border Patrol Agent Cortright stood in the northbound lane, facing Al Nasser's oncoming vehicle.

Border Patrol Agent Cortright shone his "stinger" flashlight into the front of Al Nasser's car, allegedly to alert Al Nasser to the agent's presence. Al Nasser slowed and then moved to the southbound lane in order to pass. As Al Nasser began to drive by at a slow speed, the uniformed agent followed the car with his stinger, shining it directly into the passenger window of Al Nasser's vehicle as it passed and continued forward. In Agent Cortright's own words, he shone the beam of the stinger "before, during, and after . . . the vehicle as it passed."[1]

---

[1] There is some dispute as to whether the officers made verbal orders or other additional gestures. Officer Lopez testified at the suppression hearing that Al Nasser was ordered to "stop," but the court below did not credit the officer's testimony. I harbor serious doubts about the accuracy of the factual findings of the court below, but for purposes of this dissent I accept those findings as true. My position remains the same in either case.

Al Nasser then came to a complete stop in the middle of the two-lane highway, approximately fifteen feet past the Border Patrol agent. Agents Cortright and Spivey ran to the car, and Agent Spivey yanked the keys out of the ignition. The officers then proceeded to question and arrest Al Nasser and all other occupants of his vehicle.

## II.

While a voluntary exchange between the police and a member of the public will not trigger the protections of the Fourth Amendment, an officer may not temporarily detain an individual for investigative purposes without "reasonable suspicion based on articulable facts." *United States v. Kerr*, 817 F.2d 1384, 1386 (9th Cir. 1987). Further, as the Supreme Court explained in *Mendenhall*, 446 U.S. at 556-57, "stopping or diverting an automobile in transit, with the attendant opportunity for a visual inspection of the areas of the passenger compartment not otherwise observable, is materially more intrusive than a question put to a passing pedestrian." The Court specifically recognized "the fact that the former amounts to a seizure." *Id.* at 557.

In *Kerr*, the Ninth Circuit confronted "the unusual problem of characterizing an automobile stop as either a voluntary encounter or an investigative stop." *Id.* at 1386. As we explained in that case, whether an auto stop has occurred is generally undisputed. *Id.* "The vast majority of automobile stops are initiated by police officers using flashing lights or a siren and are clearly fourth amendment seizures." *Id.* In *Kerr*, no lights were used, but the police officer drove into a one-lane driveway, thereby blocking the path of the defendant, who had been driving out. *Id.* at 1385. We ruled that such police conduct constituted an investigative stop, because the police officer's "authority and conduct provided Kerr with no reasonable alternative except an encounter with the police." *Id.* at 1387.

Al Nasser, too, adopted the only reasonable course of action, given that police vehicles with flashing lights blocked the road and, when Al Nasser attempted to circumnavigate the scene, an officer beamed his flashlight directly into the passenger compartment of Al Nasser's car. Just as in *Kerr*, the police "conduct [ ] precipitated the confrontation" and Al Nasser "could reasonably [have] conclude[d]" that the officers' actions were "directed at intercepting him." *Id.* at 1387. It was precisely on the basis of such circumstances that we ruled in *Kerr* that an investigative stop had occurred. *Id.* at 1386-87.[2]

Similarly, we previously held that a stop occurred where a uniformed officer driving a marked police car approached a vehicle and the defendant's "decision to stop was sufficiently influenced by the official appearance and conduct of the [law enforcement] agents." *United States v. Torres-Urena*, 513 F.2d 540, 541 n.1 (9th Cir. 1975). In *Torres-Urena*, the officer testified, "he stopped for us when he saw the uniforms." *Id*. Likewise, Al Nasser stopped for Agent Cortright when the uniformed patrol agent directed his flashlight into Al Nasser's moving car.

The Supreme Court has repeatedly identified the "crucial test" for whether an investigatory stop has occurred as whether a reasonable person in the defendant's position "would [have felt] at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437 (quotation and internal punctuation omitted). When Al Nasser drove up in the darkness, he saw police lights flashing, three marked police cars, two detained civilian vehicles, and a uniformed officer standing in his lane. He could have reasonably believed that all drivers were required to pull over for an administrative checkpoint of some kind. Moreover, when he attempted to continue past this roadblock, Agent Cortright

---

[2]The majority readily acknowledges the eminent reasonableness of Al Nasser's conduct yet finds no stop occurred. *See* maj. op. at 3309, 3312.

continued to shine his stinger directly into the passenger compartment of Al Nasser's car. It is completely reasonable for a driver to interpret this gesture as an attempt to get his attention and initiate an investigatory stop.

An auto stop is different from a pedestrian stop, partly because of the additional intrusion noted in *Mendenhall*, 446 U.S. at 556-57, but also because of the difference in the channels of communication. Given that the uniformed officer in this case was on foot and not inside a police car, the use of his flashlight was the most effective, if not the only, means of communicating his authority; Al Nasser reasonably recognized that fact. A driver must read and respond to police signals more ambiguous than those received by a pedestrian, who is typically asked questions by an officer within normal hearing range. Given the additional dangers inherent in driving while managing distractions from the road, a driver can easily be coerced to stop when the police are already blocking the only available lane of traffic.

"[T]aking into account all of the circumstances surrounding [Al Nasser's] encounter" with uniformed law enforcement officials on Route 15, "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437 (quotation and internal punctuation omitted).

### III.

None of the cases cited by the majority support its position. In *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) (quoting *Bostick*, 501 U.S. at 437) (internal punctuation omitted), the Ninth Circuit reiterated the rule that a "police officer has restrained the liberty of a citizen if, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence

and go about his business." *Chan-Jimenez* held that the defendant was seized within the meaning of the Fourth Amendment when the officer obtained and failed to return the defendant's license and registration. *Id.* The initial stop of the defendant's vehicle did not constitute an investigatory stop only because the defendant had chosen to pull over to examine a mechanical problem with his vehicle. *Id.* When the officer approached on foot, the car was already stopped at the side of the road, and the hood of the truck was propped open. *Id.*

Similarly, in *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994), the police officer approached a car already parked in a parking lot. The officer was not in uniform, and he never activated the flashing lights on top of his car, nor did he utilize a flashlight. *Id.* at 1430 n.1. Also, in *United States v. Judge*, 501 F.2d 1348, 1349 (9th Cir. 1974), decided just one year before *Torres-Urena*, the police officer approached an individual exiting a parked vehicle that was already stationary in a parking lot.

None of these cases concerned the question of whether the stop of a moving vehicle was investigatory or voluntary. In contrast to the defendants in *Chan-Jimenez*, *Kim*, and *Judge*, all of whom were approached after they had brought their cars to complete stops, parked them in appropriate and safe locations, and turned off their ignitions,[3] Al Nasser's vehicle was in motion, and he was actively driving along a highway when Border Patrol Agent Cortright signaled with his flashlight, and Al Nasser then responded by halting in the middle of the road. Al Nasser halted directly in the middle of the highway, several paces past Agent Cortright and the other cars. Contrary to the assertion of the majority, this cannot logically be interpreted as a move a driver would make voluntarily, simply

---

[3]The engine was running in *Chan-Jimenez,* 125 F.3d at 1326, only because necessary for the owner to investigate the vehicle's mechanical problems while he looked under the car's hood.

to "assure himself that it was safe to go on instead of speeding past all the stopped vehicles." Maj. op. at 3312.

IV.

Because the majority's decision contradicts both logic and clear precedent, I respectfully dissent. In my view, Al Nasser's conviction and sentence should be vacated, and his case should be remanded for the lower court to determine whether the officers had reasonable suspicion based on articulable facts at the time they stopped his vehicle. I therefore would not reach the sentencing issues addressed in Part II of the majority opinion.