**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

KARIM HUSSEIN AL NASSER, aka
Karim Hussein Al-Nasser, Karim
H. AlNasser, Kram Nseelt, Karim
H. Alaassar,
            *Defendant-Appellant.*

No. 05-10466

D.C. No.
CR-03-01122-NVW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
April 3, 2006—San Francisco, California
Opinion Filed March 20, 2007
Amended Opinion Filed February 4, 2009

Before: Stephen S. Trott, Andrew J. Kleinfeld, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Kleinfeld

1177

**COUNSEL**

James Sun Park, Park Law Office, PLC, Phoenix, Arizona, for defendant-appellant Karim Hussein Al Nasser.

Gary M. Restaino, Assistant U. S. Attorney, Phoenix, Arizona, for the plaintiff-appellee.

**ORDER**

The opinion filed on March 20, 2007, and appearing at 479 F.3d 1166 is amended and the dissent is withdrawn. The superseding opinion will be filed concurrently with this order.

The parties may file an additional petition for rehearing or rehearing en banc. All other pending motions are denied as moot.

## OPINION

KLEINFELD, Circuit Judge:

In this amended opinion,[1] we address the applicability of the Fourth Amendment when the police intend not to stop someone, but that person nevertheless stops. We affirm.

## FACTS

A Border Patrol agent was patrolling a stretch of highway running north from the Mexican border in Arizona through the Tohono O'odham Nation Indian reservation. He stopped a pickup truck (not the car driven by the defendant, Al Nasser) around nine at night which he suspected was carrying illegal aliens. It turned out that there were no illegal aliens in the truck, but there was alcohol, which was illegal on that part of the reservation. The Border Patrol agent called the Tohono O'odham Nation Police Department, which sent a tribal police officer to take charge of the alcohol violators. The other Border Patrol agent working on that stretch of highway came too.

Meanwhile, a sedan (also not driven by Al Nasser) drove toward the spot where the pickup truck, tribal police vehicle, and two Border Patrol vehicles were stopped. The Border Patrol agent shined his flashlight at the sedan so he would be seen, despite the darkness and his dark clothing. When he did, he saw people hiding in the back seat (he is six feet nine inches tall, and had a good view down toward the floor of the

---

[1] Judge Ferguson dissented in our earlier decision in this case, *United States v. Al Nasser*, 479 F.3d 1166 (2007). After Judge Ferguson's death, Judge N.R. Smith was drawn to replace him. Serious questions raised by the petition for rehearing, Judge Ferguson's dissent, and our colleagues within the court persuaded us to withdraw our earlier opinion and replace it with this amended opinion. Only the part of the opinion addressing the stop is changed. The disposition of Al Nasser's sentencing appeal is unchanged in substance.

car as it passed). This second vehicle appeared to be an alien smuggling car, so the Border Patrol agent gestured the driver to stop and pull over. The sedan responded by pulling off the road in front of the pickup truck. The agent then took the driver's keys, and determined that this second vehicle was indeed carrying illegal aliens.

Now there were five vehicles stopped on the road, three law enforcement vehicles with light bars flashing on two of them, plus the pickup truck carrying alcohol and the sedan carrying illegal aliens. The vehicles were pulled over on the side of the road, partially blocking the northbound lane of the two-lane highway. The southbound lane remained clear. Al Nasser drove up. The tall Border Patrol agent again shined his flashlight so he would be seen and not hit. He thought Al Nasser's car probably had illegal aliens in it, which he mentioned to the other Border Patrol agent. But he decided not to stop it, because the Border Patrol agents already had their hands full. They were still processing the illegal aliens in the sedan, and the tribal officer was still processing the people carrying the alcohol in the pickup truck. Though they thought Al Nasser was carrying illegal aliens, the agents were just too busy for another carful of illegal aliens and were going to let Al Nasser go to avoid the safety problem of having to control too many people.

But Al Nasser stopped anyway, in the middle of the road. Though he testified at the suppression hearing, neither side asked him why he stopped and he never said. Coming upon the five stopped vehicles, he may have thought that he was supposed to stop, or thought that he ought to stop to avoid danger on the road. But we do not know whether Al Nasser thought the police were stopping him. He might have believed that the Border Patrol agents wanted him to stop, since he could see three law enforcement cars with flashing lights and

two stopped vehicles. Or he might not have, since the south-bound lane was clear. No one told him or signaled him to stop.[2]

The Border Patrol agent assumed Al Nasser was Mexican and spoke to him in Spanish after Al Nasser stopped. Al Nasser was Iraqi and could not understand Spanish. Now the Border Patrol agents had Al Nasser and his passengers even though they did not want him. The people hiding on the floor of Al Nasser's car had paid coyotes in Mexico $1,000 and $1,200 respectively to be smuggled into the United States. After Al Nasser stopped of his own accord and the tall Border Patrol agent had observed the smuggled aliens in his car, one of the Border Patrol agents came over and took his keys, and the illegal aliens in the car were apprehended. Al Nasser was subsequently convicted of knowingly transporting illegal aliens.[3]

## ANALYSIS

On appeal Al Nasser raises two issues: (1) the statements made by the illegal aliens should have been suppressed as fruits of an unreasonable seizure, because he was stopped in the absence of reasonable suspicion;[4] and (2) his sentence was based on an incorrect Guidelines calculation.

I.   The Stop.

What if the police do not intend to stop someone, but a person thinks that he is being stopped? Must that unintended stop still be supported by reasonable suspicion in order to prevent suppression of its fruits? Does the "objective" examination of

---

[2]There is some dispute about this, addressed below.

[3]8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(B)(I).

[4]Al Nasser does not argue, and did not argue in district court, that he was unreasonably seized when the Border Patrol agent later approached his stopped car and took his keys, no doubt because by then the Border Patrol agent had clearly observed the aliens hiding in back.

police conduct, as required in *Whren v. United States*[5] for a vehicle stop brought about by police action undertaken to effect the stop, mean that if a reasonable person would think that he was being stopped, then the person is "seized" within the meaning of the Fourth Amendment, even if the police do not want the person to stop and intended for him to go on about his business without stopping?

There is language in some decisions[6] that might arguably lend itself to such an interpretation, but we reject it. The Fourth Amendment[7] protects people from unreasonable "seizures," and the Supreme Court "has . . . consistently construed this protection as proscribing only governmental action."[8] Al Nasser contends that he was unreasonably seized when one of the Border Patrol agents shone a flashlight towards and into Al Nasser's car as he drove by the scene described above because a reasonable person would think that he was being stopped.[9] This argument skips a step. Before asking whether a reasonable person would have thought he was being stopped, a court must ask whether the police in fact stopped him. Usually the objective circumstances would prove a stop, but not always. The government does not violate a person's right not to be stopped when its agents do not effect the stop or the person voluntarily stops. We thus do not reach the objective inquiry of whether a reasonable person in Al Nasser's position would have believed he was free to go.

---

[5]517 U.S. 806 (1996).

[6]*See, e.g.*, *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997).

[7]U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.")

[8]*United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

[9]*See supra* 1182-83.

The question of whether to apply the objective test, whether a reasonable person would have thought he was being stopped, or also to require police intent as a *sine qua non*, is but another example of the inescapable philosophical problem of causation in the law.[10] Fairly consistently, the law requires some sort of blameworthiness[11] in addition to "cause in fact," i.e., mere consequence in a factual causal chain.[12] A police officer may properly be blamed for violating a person's Fourth Amendment rights if he stops the person without reasonable suspicion. But it does not make sense to blame an officer for interfering with someone's liberty when a person stops of his own accord, particularly when the officer did nothing to effect the stop and did not intend to stop him.[13] This distinction is practical, not just philosophical. The alternative would be to require the police affirmatively to communicate to people that they were not being stopped every time a person might think the contrary, on pain of otherwise being charged with violating constitutional rights. This is a dangerous requirement if the police already have their hands full with suspects they have stopped.

**[1]** The Supreme Court held in *Herring v. United States* that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."[14] Thus, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently

---

[10]H.L.A. Hart & Tony Honore, Causation in the Law (2d ed. 1985).

[11]*Id.* at 62-68; *see also Herring v. United States*, No. 07-513, slip op. at 7-8 (U.S. Jan. 14, 2009) ("The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct.").

[12]Hart & Honore, *supra* note 10, at 68-82.

[13]*See Herring*, slip op. at 12-13 (explaining that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct").

[14]*Herring*, slip op. at 8.

culpable that such deterrence is worth the price paid by the justice system.["][15] There is nothing to deter when the police do not mean to stop someone.[16] The fact that the person mistakenly thinks that he is being stopped does not require suppression of the fruits of the person's voluntary stop.

A.   The District Court's Findings of Fact Are Not Clearly Erroneous.

The district court did not decide whether the alleged seizure in this case was reasonable. Rather, after an evidentiary hearing, it concluded that there was no seizure at all. We are bound by the district court's findings of fact unless they are clearly erroneous,[17] and we review *de novo* whether on those facts there was what amounted legally to a seizure.[18]

At the evidentiary hearing, the two Border Patrol agents testified that they did nothing to stop Al Nasser's car. Indeed, they did not want to have anything to do with Al Nasser:

A.   As he was passing by, I was thinking, "There goes another load of illegal aliens."

Q.   So why not stop him?

A.   We already had two vehicles stopped there, one with illegal aliens, one with alcohol, and I felt that was more than we could safely control at the time.

The tribal police officer, who was facing the other way, thought that he heard one of the Border Patrol agents holler

---

[15]*Id.* at 9.

[16]*Id.* at 8.

[17]*See United States v. Crawford*, 323 F.3d 700, 705 (9th Cir. 2003); *United States v. Kerr*, 817 F.2d 1384, 1386 (9th Cir. 1987).

[18]*See United States v. Stephens,* 206 F.3d 914, 917 (9th Cir. 2000); *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994).

stop toward Al Nasser's vehicle. That testimony established an issue of fact as to whether the Border Patrol agents did or did not tell Al Nasser to stop. The district court resolved this dispute in favor of the Border Patrol agents' version of the facts. The district court found that the agents did not want Al Nasser to stop, did not intend for Al Nasser to stop, and did not tell or otherwise signal Al Nasser to stop.

**[2]** Al Nasser contends that the district court's finding is clearly erroneous because it is contrary to the tribal officer's testimony. His argument is unpersuasive. The district court had to choose between the Border Patrol agents' testimony and the tribal officer's testimony, neither of which were implausible. When Al Nasser testified, he did not say why he stopped or that anyone signaled him to stop. The conspicuous absence of Al Nasser's testimony on this subject supports the district court's resolution of the conflicting evidence. The district court's choice of one of the two plausible accounts was not clearly erroneous.[19]

### B.   A Voluntary Stop Is Not a Seizure.

Determining whether to apply a subjective or objective test to police conduct is a practical exercise, not a metaphysical one. The purpose of either test is "to avoid the kind of 'arbitrary and oppressive interference by [law] enforcement officials with the privacy and personal security of individuals' that the Fourth Amendment was intended to limit."[20]

**[3]** In *United States v. Mendenhall*,[21] the Supreme Court articulated an objective test of what constitutes a "seizure" for

---

[19]*See United States v. Elliot*, 322 F.3d 710, 715 (9th Cir. 2003) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quotes omitted)).

[20]*Breindlin v. California*, 127 S. Ct. 2400, 2410 (2007); *see also United States v. Ortiz*, 422 U.S. 891, 895 (1974).

[21]446 U.S. 544 (1979).

the purposes of the Fourth Amendment. It did so in the process of finding that no seizure had occurred. In *Mendenhall*, DEA agents spotted a woman getting off a plane whom they thought was a drug courier, so they approached her and asked to see her identification and plane ticket.[22] The Court concluded that the DEA agents were free to ask, and the woman was free to refuse and walk away. In holding that the officer's approach of the woman and request to see her ticket and identification was *not* a stop, the Court explained that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[23] Likewise, the Court applied the objective "reasonable person" test in *Michigan v. Chesternut*,[24] which held that driving a police cruiser alongside an apparent drug dealer as he ran away was *not* a seizure.[25]

**[4]** Subsequently, the Supreme Court has made clear that its decisions holding that an encounter is *not* a seizure when a reasonable person would feel free to leave do not mean that an encounter *is* a seizure just because a reasonable person would not feel free to leave. In fact, the Court has expressly rejected such an inference. Concluding that a roadblock placed across both lanes of a two-lane highway *was* a seizure, the Court held in *Brower v. County of Inyo*[26] that police intention made the difference. "Violation of the Fourth Amendment requires an *intentional* acquisition of physical control."[27] "It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the inno-

---

[22]*Id.* at 547-48.

[23]*Id.* at 554.

[24]486 U.S. 567 (1987).

[25]*Id.* at 569, 574-75.

[26]489 U.S. 593 (1988).

[27]*Id.* at 596 (emphasis added).

cent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*."[28] The Court thus supplemented the objective inquiry of whether a "reasonable person would have believed that he was not free to leave,"[29] with a requirement that the detention be "willful."[30] This latter requirement arises because "the Fourth Amendment addresses 'misuse of power,' . . . not the accidental effects of otherwise lawful government conduct."[31]

That intentionality was the focus of the Court's inquiry is clear from the separate opinion concurring in judgment in *Brower*. The separate opinion conceded that intentional acquisition of physical control characterized the typical seizure, but questioned whether it was an essential element in every seizure.[32] The majority opinion rejected the separate opinion's suggestion that the "reasonable person would have believed that he was not free to leave"[33] test alone sufficed.[34]

The *Brower* intentionality requirement for a seizure was reaffirmed in *Scott v. Harris*.[35] In *Scott*, the Court held that "a Fourth Amendment seizure [occurs] when there is a governmental termination of freedom of movement through *means intentionally applied*."[36] In *California v. Hodari D.*,[37] the

---

[28]*Id.* at 596-97 (emphasis in original).

[29]*Mendenhall*, 446 U.S. at 554.

[30]*Brower*, 489 U.S. at 596.

[31]*Id.* (citation omitted).

[32]*Id.* at 600 (Stevens, J., concurring in judgment).

[33]*Mendenhall*, 446 U.S. at 554.

[34]*Brower*, 489 U.S. at 596-97, 600.

[35]127 S. Ct. 1769 (2007).

[36]*Id.* at 1776 (citing *Brower*, 489 U.S. at 596-97) (emphasis added).

[37]499 U.S. 621 (1991).

Court clarified that this "reasonable person" test means "that a person has been seized 'only if [the test is met,]' not that he has been seized 'whenever' [the test is met]; it states a *necessary,* but not a *sufficient,* condition for seizure."[38]

In *Brendlin v. California* the Court analyzed whether an unintended target, the passenger in a vehicle, was seized during a traffic stop and reaffirmed the requirement that "the detention [be] 'willful' and not merely the consequence of an unknowing act."[39] The Court did apply the objective test, whether "a reasonable person would have believed that he was not free to leave,"[40] but only after asking and finding that the means of stopping the car in which the passenger was riding were intentionally applied to accomplish the seizure.[41] Not only must the car or individual's freedom of movement end, but that termination must occur through "means intentionally applied."[42] The Court clarified that the "intent that counts under the Fourth Amendment is the intent that has been conveyed to the person confronted, and the criterion of willful restriction on freedom of movement is no invitation to look to subjective intent when determining who is seized."[43] Thus, there was no seizure when a police officer accidentally ran over a passenger who fell off a motorcycle that the officer was chasing, because running over the passenger was not a "means intentionally applied" to stop the motorcycle.[44] The objective circumstances in *Bower* and *Brendlin* left no doubt that the official conduct was directed at curtailing a particular car's freedom of movement, just as the circumstances in

---

[38]*Hodari D.*, 499 U.S. at 628.

[39]*See Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007)

[40]*United States v. Mendenhall*, 446 U.S. 544, 554 (1979).

[41]*Brendlin*, 127 S. Ct. at 2409.

[42]*Id.*; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).

[43]*Brendlin*, 127 S. Ct. at 2409 (internal quotation marks, alteration and citation omitted).

[44]*Lewis*, 523 U.S. at 843.

*Lewis* left no doubt that the officer did not engage in the high-speed pursuit to ram the motorcycle's passenger if he unexpectedly fell off the motorcycle.

**[5]** Further, *Breindlin* states that motorists much like Al Nasser, who are compelled to slow down or even stop because of traffic congestion caused by a police stop of a preceding car are not themselves "seized," even though their stop is compelled by police conduct.[45] In analyzing this hypothetical, the Court distinguished the effect on these motorists — an "incidental restriction" — from an intentional application of government authority that might implicate the Fourth Amendment. Specifically, the Court observed that "an occupant of a car who knows that he is stuck in traffic because another car has been pulled over (like the motorist who can't even make out why the road is suddenly clogged) would not perceive a show of authority *as directed at him or his car*."[46] The circumstances in such situations clearly convey that the officer had no intent to stop the vehicles passing near or around the targeted vehicles. "Nor would the consequential blockage [from the traffic stop of another car] call for a precautionary rule to avoid the kind of 'arbitrary and oppressive interference by [law] enforcement officials with the privacy and personal security of individuals' that the Fourth Amendment was intended to limit."[47]

Our cases are consistent with this analysis. In *United States v. Judge*,[48] we held that no seizure occurs when a driver "stop[s] his car voluntarily and [the police] in no way ordered or requested him to do so."[49] In *United States v. Chan-Geminis*,[50]

---

[45]*Brendlin*, 127 S. Ct. at 2409-10.

[46]*Id.* at 2410 (emphasis added).

[47]*Id.* at 2409.

[48]501 F.2d 1348 (9th Cir. 1974).

[49]*Id.* at 1349.

[50]125 F.3d 1324 (9th Cir. 1997).

a tribal police officer followed a pickup truck, then pulled over and activated his emergency lights after the truck stopped and the driver raised the hood, ostensibly indicating a mechanical problem. The officer did not return the driver's license and registration after confirming that they were "in order," but instead asked to search the truck. We held that a seizure occurred when the officer did not return the license and registration after finding that they were in order.[51] We did not characterize officer's following the truck until it stopped as a seizure. Similarly, in *United States v. Summers*,[52] we held that no constitutionally protected rights are implicated when an encounter between a police officer and person is voluntary, and the driver of the vehicle is stopped of his own volition.[53]

The language in *Brower*, *Scott*, and *Brendlin* fits this case. Al Nasser's stop was governmentally "caused" in a "but for" sense: he would not have stopped if the Border Patrol agents and tribal officers had not been present, with lights flashing on three stopped government vehicles next to two stopped civilian vehicles. But, Al Nasser's stop was not a "seizure," because the government actors (who wanted him to go away, not stop) clearly did not pull over the two other vehicles, engage the emergency lights of two police vehicles, and shine a flashlight at Al Nasser's vehicle as he approached and passed the scene in order to make Al Nasser stop. Although they intended to stop the two other vehicles, they did not intend to curtail Al Nasser's freedom of movement (except perhaps to the extent he needed to go around the stopped vehicles). The *sine qua non* for a Fourth Amendment seizure was missing because the means that led him to stop — the lights, stopped vehicles and officer directing traffic — were not "means intentionally applied"[54] to bring about the stop of

---

[51]*Id.* at 1236.

[52]268 F.3d 683 (9th Cir. 2001).

[53]*Id.* at 686-87.

[54]*Brendlin v. California*, 127 S. Ct. 2400, 2409 (2007).

Al Nasser's car. Those actions, without more, did not demonstrate an intent to stop every vehicle that drove past.

This case is therefore distinct from *Brendlin*, in which the officer's show of authority was unambiguously directed at the vehicle in which Brendlin was a passenger and caused it to pull over, thereby limiting Brendlin's freedom of movement. Rather, this case is similar to the hypothetical "incidental restrictions" the Court discussed in *Brendlin*.[55] The intent of the officers directing traffic around an accident or pulling over a particular vehicle is clear and unmistakable from the circumstances. In the former context, the officer intends to stop no one; in the latter context, the officer intends to seize only the car stopped, not the cars "following the vehicle subject to the traffic stop."[56]

Analogously, suppose a police car approaches a driver's car from behind, with siren blaring and lights flashing. The driver, in accord with his reasonable belief that he is being stopped, pulls onto the shoulder and stops. But the policeman is chasing somebody else, who was ahead of the driver who pulled over and the police car continues down the road. It cannot reasonably be argued that the driver who pulled over was "stopped" within the meaning of the Fourth Amendment, and that accordingly reasonable suspicion was required for the stop. The policeman has not violated the driver's constitutional rights even though a reasonable driver would think he was being stopped. That is because the policeman did not intend to stop him, even though a reasonable driver in his position would think that he was being stopped.

This case is also distinct from consensual encounters between a citizen and a police officer that evolve into seizures.[57] For example, a police officer who begins questioning some-

[55]*Id.* at 2409-10.

[56]*Id.* at 2409.

[57]*See INS v. Delgado*, 466 U.S. 210, 215 (1984).

one without reasonable suspicion unambiguously has focused the officer's attention on that person. The means intentionally applied are the officer's questioning of the suspect and related conduct, which are unmistakably directed at the suspect in the context of a conversation with the suspect.

**[6]** A person is seized when he is "*meant to be stopped* by [a particular law enforcement action] . . . and [is] so stopped."**[58]** That is, a seizure occurs where a person is stopped by "the very instrumentality set in motion or put in place *in order to* achieve that result."**[59]** Here, the two Border Patrol agents and the tribal police officer did not stop their vehicles or the two civilian ones in order to make other vehicles stop. Although Al Nasser did stop, the lights and the vehicles that caused him to do so were not a roadblock put in place to accomplish that purpose. Thus, Al Nasser was thus not "seized" within the meaning of the Fourth Amendment when he stopped his car.

**[7]** Though Al Nasser might have thought that the five stopped vehicles and the Border Patrol agent in the road shining his flashlight were meant as a roadblock to stop all vehicles, they were not. In light of the district court's factual finding that the officers did not shout at Al Nasser to stop, the added detail of an officer standing in the road and shining a flashlight on passing vehicles does not suggest that the officers intended to stop Al Nasser's vehicle. Since there was no intentional government action directed at Al Nasser to bring about the stop of his vehicle, there could be no Fourth Amendment "seizure."**[60]** Looking at the converse, could a police officer be held liable for damages in a § 1983 suit if someone believed that he was being stopped, even though the officer intended *not* to stop him? Al Nasser's decision to stop

---

**[58]***Brendlin*, 127 S. Ct. at 2409. (citing *Brower v. County of Inyo*, 489 U.S. 593, 599 (1988) (emphasis added)).

**[59]***Brower*, 489 U.S. at 599 (emphasis added).

**[60]***Brendlin*, 127 S. Ct. at 2409-10.

was what the Court in *Brower* called an "accidental effect[ ] of otherwise lawful government conduct."[61]

II.   Sentencing.

Al Nasser's sentencing challenge was only to the Guidelines calculation, and we do not substantively amend our previous opinion in this respect. We review the district court's interpretation of the Sentencing Guidelines de novo and its factual findings for clear error.[62] We review the ultimate sentence for "reasonableness."[63]

Al Nasser sought a three-level downward adjustment in the Guideline calculation because the jury had answered "No" to the interrogatory asking whether he transported the illegal aliens in his car "for the purpose of commercial advantage or private financial gain." The district court denied him the adjustment, despite the absence of evidence that he received any money, because the evidence showed that the aliens had paid $1,000 and $1,200 respectively to a coyote for the transportation. The court found that "this was not an unwise, generous picking up of hitchhikers[,]" that Al Nasser "knew it was an organized activity involving commercial — commercial is the wrong word — financial gain[,]" and that Al Nasser's account of how he happened to be there with the illegal aliens was "not worthy of belief."

**[8]** The Guidelines provide for a three-level downward adjustment if the "offense was committed other than for profit, or the offense involved the smuggling, transporting, or harboring only of the defendant's spouse or child."[64] The cor-

---

[61]*Brower*, 489 U.S. at 596.

[62]*United States v. Kimbrew*, 406 F.3d 1149, 1151-52 (9th Cir. 2005).

[63]*United States v. Booker*, 543 U.S. 220, 261-62 (2005); *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).

[64]U.S. Sentencing Guideline Manual § 2L1.1(b)(1) (2003)("If (A) the offense was committed other than for profit, or the offense involved the smuggling, transporting, or harboring only of the defendant's spouse or child (or both the defendant's spouse and child), and (B) the base offense level is determined under subsection (a)(2), decrease by **3** levels.")

responding Application Note says that the "other than for profit" phrase means "that there was no payment or expectation of payment for the smuggling, transporting or harboring of any of the unlawful aliens."[65] The Guidelines formerly provided for the adjustment where "the defendant committed the offense other than for profit," but the provision was amended in 1997 to say "the offense was committed other than for profit" in order "to narrow somewhat the class of cases that would qualify for the reduced offense level."[66]

---

[65]Application Note 1 of § 2L1.1(b)(1) provides, in pertinent part: "For purposes of this guideline — 'The offense was committed other than for profit' means that there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens." *Id.* § 2L1.1, cmt., n.1.

[66]*Id.* at App. C, amend. 561. Amendment 561 provides:

Section 2L1.1 is repromulgated with the following changes:

Section 2L1.1(b)(1)(A) is amended by deleting "the defendant committed the offense" and inserting in lieu thereof "the offense was committed".

The Commentary to §2L1.1 captioned "Application Notes" is amended in Note 1 by deleting:

> " 'The defendant committed the offense other than for profit' means that there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens. The 'number of unlawful aliens smuggled, transported, or harbored' does not include the defendant.",

and inserting in lieu thereof:

> " 'The offense was committed other than for profit' means that there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens.

> 'Number of unlawful aliens smuggled, transported, or harbored' does not include the defendant."

Section 5K2.0 is amended in the third paragraph by deleting "immigration violations" and inserting in lieu thereof "other guidelines"; and by deleting "for an immigration violation" and inserting in lieu thereof "under one of these other guidelines".

**[9]** Al Nasser committed the offense on October 5, 2003, long after the narrower Guideline provision went into effect. Under the 2003 Guidelines applicable at his sentencing, it did not matter whether Al Nasser got paid, or even expected payment, because the district court did not find that the crime was committed other than for profit. Al Nasser was part of a scheme to transport the aliens for money, whether he personally received any of the money or not. An "offense was committed other than for profit" only if the offense itself was committed other than for profit, regardless of whether the particular defendant got, or expected to get, any of the money.

**[10]** The district court took account of *United States v. Booker*,[67] and although we had not yet issued our en banc decision in *United States v. Ameline*,[68] the district court anticipated it. The district court properly considered the reasonableness of Al Nasser's within-Guidelines sentence in light of all the factors in 18 U.S.C. § 3553(a), and expressly acknowledged that the Guidelines were advisory. Al Nasser argues that his 15-month sentence was unreasonable because he would be law-abiding in the future and the district court did not consider the immigration consequences. However, the district court expressly considered the immigration conse-

---

This amendment implements section 203 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009, which directs the Commission to amend the guidelines for offenses related to smuggling, transporting, or harboring illegal aliens. Pursuant to the emergency amendment authority of that Act, this amendment previously was promulgated as a temporary measure effective May 1, 1997. This version of the amendment changes § 2L1.1(b)(1)(A) (pertaining to a reduction for non-profit offenses) to narrow somewhat the class of cases that would qualify for the reduced offense level under that provision. **This amendment also makes a conforming change to §5K2.0.**

[67]543 U.S. 220 (2005).

[68]409 F.3d 1073 (9th Cir. 2005) (en banc).

quences, and then decided not to reduce the sentence further, despite whatever those consequences might be. This decision was not an abuse of discretion.[69] There is no basis for characterizing the district court's exercise of sentencing discretion, or the sentence itself, as unreasonably harsh.

**AFFIRMED**.

---

[69]*United States v. Carty*, 520 F.3d 984, 994-95 (9th Cir. 2008) (en banc).