**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Carl Eugene STEPHENS,**
**Defendant–Appellant.**

**No. 98–10374.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1999.

Filed March 20, 2000.

---

**29.** *See* 1 Kevin F. O'Malley et. al, *Federal Jury Practice and Instructions,* § 9.07 (5th ed.2000).

**30.** *See id.*

**31.** Fed.R.Evid. Rule 606(b).

**32.** *See Traver v. Meshriy,* 627 F.2d 934, 941 (9th Cir.1980).

Samantha S. Spangler, Assistant United States Attorney, Sacramento, California (argued), Michael J. Malecek, Assistant United States Attorney, Sacramento, California (brief), for the plaintiff-appellee.

Kevin D. Clymo, Sacramento, California, for the defendant-appellant.

Before: SNEED and PREGERSON, Circuit Judges, and CARTER, District Judge.[1]

Opinion by Judge PREGERSON; Dissent by Judge SNEED.

PREGERSON, Circuit Judge:

Carl Eugene Stephens appeals his conviction for possession with intent to dis-

---

1. The Honorable David O. Carter, U.S. District Judge for the Central District of California, sitting by designation.

tribute cocaine in violation of 21 U.S.C. § 841(a)(1). Stephens contends that the cocaine was discovered as a result of police conduct in violation of the Fourth Amendment. The district court admitted evidence of cocaine found in Stephens's bag over Stephens's motion to suppress. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we reverse.

## I

On September 19, 1997, defendant Carl Eugene Stephens was traveling by Greyhound bus from Los Angeles to Seattle. The bus stopped for servicing at the Greyhound station in Sacramento where the passengers were required to disembark. The stop lasted roughly one hour.

The Sacramento Transportation Interdiction Narcotic Group ("STING") routinely inspects busses at the Greyhound station for drugs and weapons. Two STING officers, Officer John Risley ("Risley") and Officer Luci Villones ("Villones"), observed Stephens while he was waiting in line to reboard the bus. They noticed that he carried a gym bag which appeared heavy and bulging. When Risley pointed Stephens out to his supervisor, the supervisor stated that he had noticed Stephens in the terminal. The STING officers did not approach Stephens at that time. The officers continued to observe Stephens as he boarded the bus and placed his bag in the overhead compartment above his seat.

At the time the bus was scheduled to depart, Villones, Risley, and a third officer boarded the bus. The officers were not wearing uniforms or displaying their badges. They carried concealed weapons. They positioned themselves at the back, middle, and front of the bus. The aisle of the bus was very narrow, and the district court found that it would have been very difficult, although not impossible, for a person to exit.

The officer at the front of the bus used the Greyhound company's public address system to speak to the passengers. He announced:

> Good morning, ladies and gentlemen. We're police officers from various agencies. We're conducting a routine narcotics and weapons investigation on this bus. No one is under arrest, and you are free to leave. However, we would like to talk to you. Thank you.

The other two officers began questioning the passengers immediately. The first passenger that Officer Risley approached was Stephens. He asked Stephens whether he had any carry-on baggage. Stephens said that he did not. Risley repeated the question, this time pointing to the overhead compartment. Stephens again replied that he did not. After the officers interviewed other passengers, Risley took the bag he had observed Stephens carrying, went to the front of the bus, and asked if anyone claimed the bag. None of the passengers claimed the bag. Risley took the bag off the bus where additional officers and a narcotics detection dog were waiting. The dog alerted to the bag. The officers opened the bag and discovered substances, later proven to be cocaine. The officers then arrested Stephens. The entire bus search lasted approximately ten to fifteen minutes.

Stephens was charged with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). He moved to suppress evidence seized from the bag. The district court denied the motion because it found that Stephens voluntarily abandoned the bag containing cocaine, and therefore lacked standing to challenge the search of the bag. Stephens was tried before a jury, found guilty, and sentenced to 240 months incarceration. He now appeals the district court's denial of his motion to suppress evidence.

## II

The first issue is whether Stephens abandoned his bag. "Whether property has been abandoned within the meaning of the Fourth Amendment is an

issue of fact reviewed for clear error." *United States v. Gonzales,* 979 F.2d 711 (9th Cir.1992). The district court found that Stephens denied ownership of the bag three times. The district court concluded that these repeated denials objectively demonstrated an intent to abandon the property. This factual finding is not clearly erroneous.

### III

■■■ The next question is whether Stephens abandoned the bag as a result of an unlawful seizure. Whether an encounter between an individual and officers constitutes a seizure in violation of the Fourth Amendment is a mixed question of law and fact that we review de novo. *See United States v. Chan–Jimenez,* 125 F.3d 1324, 1326 (9th Cir.1997); *United States v. Johnson,* 903 F.2d 1219, 1221 (9th Cir. 1990).

■■■ A defendant who voluntarily abandons property has no standing to contest its search and seizure. *United States v. Garcia,* 909 F.2d 389, 391 (9th Cir.1990). But "abandonment is a question of intent." *United States v. Nordling,* 804 F.2d 1466, 1469 (9th Cir.1986). "An abandonment must be voluntary, and an abandonment that results from Fourth Amendment violation cannot be voluntary." *United States v. Austin,* 66 F.3d 1115, 1118 (10th Cir. 1995); *see also United States v. Garzon,* 119 F.3d 1446, 1451 (10th Cir.1997) ("Abandonment will not be recognized when it is the result of prior illegal police conduct."). Stephens argues that he involuntarily abandoned the bag as a result of an unlawful seizure. We agree.

■■■ Police officers may not approach passengers on a bus, and request their consent to be questioned and searched if the officers "convey a message that compliance with their requests is required." *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The test for whether a bus search is constitutional is not whether a reasonable person would feel "free to leave." *Id.* at 436, 111 S.Ct. 2382. The test is whether, considering all of the circumstances, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* This is because "when a person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." *Id.*

Here, the STING officers advised passengers that they were "free to leave" the bus. They did not tell passengers that they were free to remain on the bus and terminate the encounter by declining to answer their questions. The instructions given over the Greyhound public address system conveyed to passengers that they had two choices: stay on the bus and consent to the search, or get off the bus. This was a Hobson's choice because by getting off the bus, a passenger ran the risk of giving the STING officers reasonable suspicion to stop him. *See Illinois v. Wardlow,* —— U.S. ——, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (holding that flight from police officers in an area known for drug activity is enough to create reasonable suspicion).[2]

■■■ Other factors also weigh in favor of finding that the encounter was a seizure. The encounter took place in "the cramped confines of a bus." *Bostick,* 501 U.S. at 434, 111 S.Ct. 2382. Three officers boarded the bus, while others waited

---

**2.** The dissent asserts that "the coercive effect of the words spoken by the officers should be measured by their effect on an 'innocent' person. The majority analysis measures their effect on the 'guilty' person." *See supra* at 919. The dissent misreads our opinion. What we conclude is that no passenger, inno-

cent or guilty, would have felt free to refuse to answer the officers' questions while remaining on the bus. Obviously, an innocent passenger may desire to preserve her privacy and to refuse to consent to a police search, just as a guilty passenger might.

outside. Two officers questioned the passengers, while a third guarded the door. The officers used the bus company's public address system, thus conveying their authority to the passengers. Officer Risley singled Stephens out by positioning himself next to Stephens's seat and questioning him first. In light of all the circumstances, we find that Stephens was seized.[3] In reaching this decision, we join the Eleventh Circuit which has found an unconstitutional seizure occurred under very similar facts. *See United States v. Washington,* 151 F.3d 1354 (11th Cir.1998) (holding that a bus sweep was a seizure where two plain clothed officers with concealed weapons boarded bus as it was about to depart and used the public address system to tell passengers that they were conducting a routine bus search, but did not tell passengers that they could refuse to answer questions). The fact that the STING officers could have made the encounter even more coercive by displaying their guns and badges, wearing uniforms, or threatening the passengers does not alter our conclusion.

## IV

The judgment of the district court is REVERSED.

### SNEED, Circuit Judge, Dissenting:

The majority rests its conclusion on the proposition that the encounter on the bus was an unlawful seizure. I respectfully dissent.

Within this nation there is an enduring tension between the common needs of all and the separate and distinct needs of individuals. The facts of this case reflect this tension. The Nation has made traf-

ficking in certain drugs illegal. Nonetheless, many persons wish to acquire and use drugs. Inevitably, an illicit market in these drugs developed, staffed both by numerous lords and lackeys. The defendant in this case is but a lackey.

Our laws of search and seizure, which rest on the Constitution, protect not only the lords and lackeys of the illicit drug trade, but also by the fair and rigorous enforcement of these laws, the Constitution and the collective will of the people.

The search and seizure law under the Constitution draws a line between the practices in law enforcement which are constitutional and those which are not. In so doing, a just balance between the interest of the Nation and of those engaged in the illicit drug traffic must be struck. Not even judges always agree on what constitutes such a balance. This is one of those cases.

The case most relevant is *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). At page 437–38, the Supreme Court observed:

The facts of this case, as described by the Florida Supreme Court, leave some doubt whether a seizure occurred. Two officers walked up to Bostick on the bus, asked him a few questions, and asked if they could search his bags. As we have explained, no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required. Here, the facts recited by the Florida Supreme Court indicate that the officers did not

---

**3.** We make two additional observations. First, additional officers and a narcotics detection dog were waiting outside the bus. It is not clear from the record whether the additional officers and the dog were visible to Stephens from his seat on the bus. If they were visible to Stephens, their presence would have increased the coerciveness of the encounter even further. Second, although courts are not empowered to forbid law enforcement practices because they find them "distasteful," *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382, we note that the supervisor had noticed Stephens in the terminal where the STING officers could have approached Stephens in a less confined, and therefore less coercive, environment.

point guns at Bostick or otherwise threaten him and that they specifically advised Bostick that he could refuse consent.

Nevertheless, we refrain from deciding whether or not a seizure occurred in this case. The trial court made no express findings of fact, and the Florida Supreme Court rested its decision on a single fact—that the encounter took place on a bus—rather than on the totality of the circumstances. We remand so that the Florida courts may evaluate the seizure question under the correct legal standard. We do reject, however, Bostick's argument that he must have been seized because no reasonable person would freely consent to a search of luggage that he or she knows contains drugs. This argument cannot prevail because the "reasonable person" test presupposes an *innocent* person. (emphasis added).

This quotation makes clear that the analysis of the coercive effect of the words spoken by the officers should be measured by their effect on an "innocent" person. The majority analysis, however, measures their effect on the "guilty" person.[1]

Although the majority acknowledges that in this case the officers advised the passengers they were not under arrest and were "free to leave" the bus, it discounts its significance because of its creation of a risk peculiarly dangerous to a drug courier while also irksome to an innocent passenger. *See* p. 916, Majority Opinion. The

announcement, while not perfect, was at least effective in reducing the anxiety of the innocent passengers. Nevertheless, the majority seeks to destroy the effectiveness of the announcement by a pointing to the "cramped confines" of the bus and the presence of two officers questioning passengers while a third "guarded" the door. *Bostick* does not justify such a conclusion.

The "cramped confines of a bus" is only one factor in determining whether a seizure was unlawful. Other factors include (1) whether the police specifically advised the defendant that he had a right to refuse consent; (2) whether the police used authoritative language or tone of voice to indicate that compliance was required; (3) whether the officers threatened the defendant with a gun or otherwise; and (4) the number of agents present and their proximity to the defendant. *See Bostick*, 501 U.S. at 432, 437, 111 S.Ct. 2382; *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (authoritative language or tone of voice); *Orhorhaghe v. INS*, 38 F.3d 488, 494 (9th Cir.1994) (number of agents and their proximity).

The encounter between Stephens and the officers under *Bostick* did not constitute a seizure. Stephens had three choices: either to truthfully respond to Officer Risley's question inquiring whether he had any baggage, to deny that he had baggage, or to ignore the question and say nothing.[2] Had he chosen to remain silent

---

1. The majority attempts to refute this assertion by claiming that "no passenger, innocent or guilty, would have felt free to refuse to answer the officers questions while remaining on the bus." Majority opinion at 917, n. 2. However, their assertion overestimates the sense of terror that innocent people would have when asked simple questions. Thus, the majority's portrayal of the innocent passengers is akin to Robert Burns' portrayal of the mouse as a "Wee, sleekit, cow'rin, tim'rous beastie." Robert Burns, *To a Mouse: On Turning Back Her Nest with a Plough, November 1785, in* The Golden Treasury of the Best Songs and Lyrical Poems in the English Language (Francis Turner Palgrave ed., London,

MacMillan 1875). I respectfully disagree with this portrayal.

2. There exists no requirement under existing Supreme Court decisions that a Miranda-like warning incorporating the advice that all passengers, including the defendant specifically, could stay on the bus and refuse to answer any questions. Nor should there be such a requirement. Its existence might well require that all baggage of bus passengers routinely be submitted to canine sniffs before departure. This presently appears to be unnecessary. The general public quite reasonably looks to law enforcement officials to enforce the law with minimum inconvenience to it.

it is likely that after all other passengers had denied ownership of the bag that it would have been removed from the bus to facilitate a dog sniff. Following an alert, Stephens very likely would have been arrested.

Of course, an innocent person who does not wish to consent to a search of his bag would not deny ownership of the bag. Rather, he would claim ownership of the bag and simultaneously withhold his consent to search it. Stephens could have done so and the STING officers lawfully could have done nothing further at that time. However, he likely feared the consequences of accepting ownership of the bag and thus abandoned it. This behavior is not consistent with the behavior of an innocent person, but rather that of a guilty person.

This merely illustrates the effectiveness of the technique employed by law enforcement officials. An innocent person may be inconvenienced but a guilty person frequently will give himself away. The inconvenience of the innocent does not turn the encounter into an unlawful seizure. An innocent person under these circumstances would not feel threatened by a simple question regarding ownership of a bag. As *Florida v. Bostick* makes clear, it is only when the "innocent" feel compelled to cooperate that the encounter runs afoul of the Fourth Amendment. Stephens put himself in a vulnerable position when he undertook to transport by bus such a large quantity of drugs. It was the drugs that he undertook to transport, not the conduct of the police, that led him to deny his ownership of the bag.

It can be argued that the actions of the officers in this case are inherently dangerous to the safety of all passengers seated on the bus and thus should be unconstitutional per se. The thought is that the suspect may attempt to bolt and that any response by the officers possibly would place the innocent in danger. The argument is not baseless; however, *Bostick*

suggests that so long as the police aboard the bus conduct themselves politely and respectfully the procedure employed in this case was not unconstitutional.

Similar concerns about the safety of innocent passengers have prompted the distinction between instances in which the officers had no suspicion of any wrongdoing before boarding the bus and those in which suspicion previously had been aroused prior to the boarding. In the latter case, the officers would be required under the Constitution, it is argued, either to attempt to make the arrest prior to boarding or to forgo further efforts to arrest at that location. The *Bostick* Court could have so stated but it failed to do so. I see no sufficient reason to anticipate such a result.

I would affirm the conviction.

The facts of this case strongly suggest that present practices achieve that end.