

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD78653 |
| | ) | |
| v. | ) | OPINION FILED: October 18, 2016 |
| | ) | |
| JOSEPH FOUNTAIN PERRY, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Livingston County, Missouri**
The Honorable Thomas N. Chapman, Judge

Before Division Two: Karen King Mitchell, Presiding Judge, Cynthia L. Martin, Judge
and Gary D. Witt, Judge

Joseph Perry ("Perry") appeals from a jury conviction for possession of a controlled substance and his subsequent sentence to eight years imprisonment. Perry argues that the trial court erred in overruling his motion to suppress methamphetamine found as a result of an encounter with law enforcement. Perry claims that the evidence should have been excluded because the encounter constituted a seizure that was not supported by a reasonable suspicion that Perry was involved in illegal activity. Perry also argues that the trial court plainly erred in sentencing him because the trial court was under a mistaken

belief that the appropriate range of punishment included a minimum term of five years imprisonment. We reverse.

## Factual and Procedural Background

Officer Jodi Huber, of the Chillicothe Police Department, was out on patrol. She purposefully drove past Perry's house on more than one occasion during her patrol because Officer Huber believed Perry was selling methamphetamine out of his house. On one such occasion, Officer Huber saw Perry backing a truck out of the driveway. Officer Huber checked the vehicle's registration and identified the truck as belonging to Perry. Officer Huber began following the vehicle.

Officer Huber radioed dispatch to check Perry's driving status. Officer Huber believed Perry might be driving with a suspended driver's license. Officer Huber held this belief because of a conversation she had with another officer, Officer Maples, about two weeks prior. Officer Huber and Officer Maples were discussing people in the area with suspended driver's licenses, and Officer Maples mentioned Perry.

Dispatch located several people with Perry's name and asked Officer Huber for a date of birth in order to check the driving status for the right person. Officer Huber suggested that Perry might have been born in the 1970's. Officer Huber continued to follow Perry for two to four minutes while waiting for confirmation about his driving status. Officer Huber still had not received confirmation about Perry's driving status when Perry parked his car in his fiancé's driveway. Officer Huber decided to make contact with Perry anyway. She stopped her vehicle in the street near the end of the driveway and "jumped

2

out." [S.H. Tr. 44]  She approached Perry as he stood on private property within a few feet of his vehicle.  [S.H. Tr. 27]

As Officer Huber approached Perry, she said: "[Perry], do you have a valid driver's license?  I believe you're suspended."  [SH Tr. 27][1]  Perry responded that he was not suspended.  Officer Huber said: "Well do you have your driver's license on you and can I see it?"  [SH Tr. 27]  Perry complied with Officer Huber's request, and handed over his driver's license.  Officer Huber testified that her intent in making contact with Perry was to make him "show me his license since I still had not heard back from dispatch."  [SH Tr. 45]  Officer Huber testified that the only reason she "came into contact with [Perry was] because [she] believed he was suspended."  [SH Tr. 49]  When asked to confirm that "Perry wasn't getting away," Officer Huber responded that she "was going to make contact with [Perry] . . . to show me his license since I still had not heard back from dispatch."  [S.H. Tr. 44-45]

Officer Huber testified that "someone producing a valid license [would not] end [her] inquiry into suspicion."  [SH Tr. 28]   Instead, Officer Huber testified that she would still need to "run a check to make sure that it's valid."  [SH Tr. 28]  With Perry's driver's license in hand, Officer Huber attempted to make contact with dispatch to determine whether the license was valid.  Officer Huber's attempts were unsuccessful because, according to Officer Huber, she was unaware her vehicle's radio was not set properly to permit the transmission.

---

[1]"SH Tr." refers to the suppression hearing transcript.

3

While Officer Huber was attempting to contact dispatch to confirm Perry's driving status, Perry turned away from her and put his hand in his pocket. He pulled out what appeared to Officer Huber to be a plastic bag and held the bag in a clenched fist. Officer Huber could see a small corner of the bag. Officer Huber asked Perry to come over to her. Perry ignored Officer Huber's request and focused on removing a bicycle from his truck and pushing it along the driveway. He maintained a clenched fist. Officer Huber followed Perry along the driveway and around to the front of his truck. Officer Huber again asked Perry to come over to her. Perry ran away.

Officer Huber pursued Perry on foot. Perry came to a chain-link fence. He hesitated at a fence post for a moment and then jumped over the fence. His hands were open once he was over the fence, and he began to walk. By this point, Sheriff Steve Cox had arrived on the scene. Perry surrendered himself to Sheriff Cox. During a subsequent search of the area, another officer found a plastic bag in the hollow top of the fence post where Perry hesitated. It was later determined that the bag contained methamphetamine.

Perry was charged with possession of a controlled substance with intent to distribute under section 195.211,[2] which is a class B felony. It was later determined that Perry's driver's license was not suspended. [SH Tr. 39]

Prior to trial, Perry moved for suppression of the methamphetamine. The State argued that Perry had no standing to assert a Fourth Amendment violation because the methamphetamine was found in a fence post on property Perry did not own, and that as a

---

[2]All statutory reference are to RSMo 2000 as supplemented unless otherwise indicated.

result, the Fourth Amendment was not implicated. [SH Tr. 60] In the alternative, the State argued that at the moment Perry was arrested, there was probable cause to do so. The State argued that the initial investigation of Perry's driving status was a consensual encounter outside the realm of the Fourth Amendment, and that no seizure occurred until "the end of the contact, after [Perry is] running with drugs." [SH Tr. 61] Perry responded that Officer Huber's initial encounter with him to check his driver's license was a seizure that required reasonable suspicion based on specific and articulable facts that Perry was involved in criminal activity, and that in the absence of that, the drugs located during the course of the unlawful seizure were subject to suppression. [SH Tr. 62-63] The trial court overruled the motion to suppress without explaining its rationale.

Perry preserved his suppression argument by objecting to the admission of the drug evidence at trial and in his motion for judgment of acquittal or new trial. During trial, there was no appreciable difference in Officer Huber's testimony from that given during the suppression hearing.

A jury found Perry guilty of the lesser included offense of possession of a controlled substance pursuant to section 195.202, a class C felony. The trial court found Perry to be a prior and persistent offender under section 558.016.

Perry's conviction of a class C felony subjected him to a maximum sentence of seven years imprisonment and a minimum sentence of zero years. Section 558.011. However, as a prior and persistent offender under section 558.016, the authorized maximum sentence for Perry's class C felony increased to any sentence authorized for a class B felony. Section

5

558.016.7(3). A class B felony carries a minimum sentence of five years imprisonment. Section 558.011.1(2).

When discussing the appropriate range of punishment at Perry's sentencing hearing, the trial court, given Perry's status as a prior and persistent offender, stated that the applicable sentencing range was between five and fifteen years' imprisonment, enhancing both the minimum and the maximum class C felony sentence. The trial court asked defense counsel whether that range was appropriate, and defense counsel agreed. The trial court then sentenced Perry to eight years imprisonment.

This timely appeal followed.

## Analysis

Perry argues two points on appeal. His first point argues that the trial court erred in overruling his motion to suppress evidence obtained as a result of his encounter with Officer Huber. Perry claims that the encounter was an unlawful seizure made without reasonable suspicion. Perry's second point argues that the trial court plainly erred by sentencing Perry under a materially false belief about the possible range of punishment.[3]

## Point One

Perry claims that the methamphetamine obtained as a result of his encounter with Officer Huber should have been suppressed and not admitted at trial over his objection

---

[3]The State concedes that the trial court sentenced Perry based on a legally erroneous belief that both the minimum and maximum range of sentence for his class C felony should be enhanced, when in fact only the maximum sentence should have been enhanced by Perry's section 558.016 status as a prior and persistent offender. *See State v. Cowan*, 247 S.W.3d 617, 619 (Mo. App. W.D. 2008). Although the claim of error is subject only to plain error review, the State concedes that Perry is entitled, at a minimum, to a remand for resentencing as a result of this appeal. *Id.* (holding that "[a] sentence passed on the basis of a materially false foundation lacks due process of law and entitles the defendant to a reconsideration of the question of punishment in the light of the true facts, regardless of the eventual outcome").

6

because the encounter violated the Fourth Amendment to the United States Constitution and article I, section 15 of the Missouri Constitution.[4]

At a hearing on a motion to suppress, the State must prove that the motion should be overruled by a preponderance of the evidence. *State v. Grayson*, 336 S.W3d 138, 142 (Mo. banc 2011). "[T]he State bears both the burden of producing evidence and the risk of nonpersuasion" that, based on the evidence it produces, the motion should be overruled. *Id*. (quoting *State v. Franklin*, 841 S.W.2d 639, 644 (Mo. banc 1992)). "When reviewing a trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005). "The Court defers to the trial court's determination of credibility and factual findings, inquiring only 'whether the decision is supported by substantial evidence, and it will be reversed only if clearly erroneous.'" *State v. Goff*, 129 S.W.3d 857, 862 (Mo. banc 2004) (quoting *State v. Edwards*, 116 S.W.3d 511, 530 (Mo. banc 2003)). "Whether conduct violates the Fourth Amendment is a question of law, which is reviewed *de novo*." *State v. Hillman*, 417 S.W.3d 239, 246 (Mo. banc 2013).

The State contends on appeal that Perry's motion to suppress was properly overruled for two reasons. First, the State contends that Perry does not have standing to assert a constitutional violation because the methamphetamine was abandoned in the fence post on property Perry did not own. Second, the State contends that the drugs were found during

---

[4]"Article I, section 15 of the Missouri Constitution provides the same protection against unreasonable searches and seizures as that of the Fourth Amendment. Consequently, the same analysis applies under both provisions." *State v. Grayson*, 336 S.W.3d 138, 143 n.2 (Mo. banc 2011) (citation omitted).

a lawful *Terry*[5] stop because "there were specific and articulable facts which created a reasonable suspicion that [Perry] had committed a crime: specifically, driving with a suspended license, as well as possible distribution of methamphetamine." [Respondent's Brief, p. 19] For ease of discussion, we address these arguments in reverse order.

### Perry was Seized Unlawfully in Violation of His Fourth Amendment Rights and the Trial Court Erred in Admitting at Trial Evidence Derived from that Seizure

A seizure occurs when "the totality of the circumstances surrounding the incident indicates that a reasonable person would have believed that he was not free to leave." *Grayson*, 336 S.W.3d at 143 (quoting *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007)). Perry argues that he was seized by this definition when Officer Huber stopped her vehicle after following him for several minutes and asked him for his driver's license, expressing suspicion that he was driving suspended. During the suppression hearing, the State argued that this initial encounter was not a seizure, and was instead a consensual encounter that falls outside the realm of the Fourth Amendment seizure. On appeal, the State has abandoned this argument.[6] The State now concedes that the initial encounter between Officer Huber and Perry was a *Terry* stop which was subject to the Fourth Amendment. However, the State argues that the *Terry* stop was lawful because it was supported by reasonable suspicion.

---

[5]*Terry v. Ohio*, 392 U.S. 1 (1968).

[6]The dissent disagrees, noting that the State's Brief does not express a concession on this point. That is irrelevant. It is beyond argument that the State makes no effort on appeal to defend the stop as consensual, and instead characterizes the stop as a *Terry* stop. Though we are to affirm a trial court on any basis supported by the record, where, as here, the State bears the burden of proof and persuasion on the issue of the lawfulness of a warrantless search, the State's characterization of the stop on appeal is both compelling and supported by the record.

A police officer may make an investigatory stop of a person, in the absence of probable cause, when the officer has reasonable suspicion to believe that a person is engaging in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). As the State now concedes, the evidence offered during the suppression hearing plainly established that Officer Huber made an investigatory *Terry* stop of Perry. Officer Huber testified that her intent in making contact with Perry was to make him show her his license because she believed he was driving with a suspended license. Officer Huber testified that this was the only reason she "came in contact with [Perry]." [SH Tr. 49] Officer Huber reported her suspicion of criminal activity to Perry immediately after getting out of her patrol car to approach him. Though Perry denied his license was suspended, Officer Huber nonetheless requested the license, and Perry complied. Officer Huber testified that Perry's production on her request of a seemingly valid driver's license did not end her suspicion, but required her to run the driver's license to determine its validity. In short, Officer Huber stopped Perry to investigate whether Perry was driving with a suspended driver's license.

Given the totality of these circumstances, which included the fact that Officer Huber had been following Perry for two to four minutes, a reasonable person would not have felt free to leave after Officer Huber pulled up to their parked car, told them of a suspected suspended license, and asked for a valid driver's license to prove otherwise. *See United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) (where vehicle followed by police car pulled over independently and officer asked for driver's license and registration, driver was seized when officer "obtained and failed to return his driver's license and

9

registration, and proceeded with an investigation").  The plurality opinion in *Florida v. Royer* is also insightful on this point:

> "Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment."

460 U.S. 491, 501 (1983).  Four members of the United States Supreme Court held that the circumstances "surely amount to a show of official authority such that 'a reasonable person would have believed he was not free to leave.'"  *Id.* at 502 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Similarly, we conclude that a reasonable person would not have believed that he or she was free to leave where Officer Huber was obviously identifiable as a police officer; had followed Perry in her patrol car for several minutes for several blocks, while Perry's vehicle made several turns, and even stopped so a passenger could exit; stopped her car in a lane of travel at the end of a private driveway immediately after Perry turned and parked in that driveway; jumped out of her patrol car and approached Perry on private property immediately after he exited his vehicle; announced to Perry that she wanted to talk to him because he was suspected of driving with a suspended license; asked him to produce his driver's license in order to quell her suspicion even though Perry told her he was not suspended; kept the license while attempting to verify Perry's driving status; and testified that her intent in making contact with Perry was to resolve one way or the other her

10

suspicion that he was driving suspended.[7] *See State v. Gabbert*, 213 S.W.3d 713, 719 (Mo. App. W.D. 2007) (finding that "[t]he totality of circumstances indicates that [defendant] was seized because he voluntarily submitted to [the officer's] authority" where use of language indicated request of suspect was mandatory); *see also United States v. Villa-Gonzalez*, 623 F.3d 526, 533 (8th Cir. 2010) ("Without his identification card, a reasonable person is much less likely to believe he can simply terminate a police encounter."). That is particularly so here, given the history between Perry and law enforcement developed in the record during the suppression hearing.[8]  Thus, Perry was seized under the Fourth Amendment at the time Officer Huber requested, obtained, and kept Perry's driver's license for the purpose of conducting further investigation of its status.[9]

The next issue to be addressed is whether Officer Huber's *Terry* stop of Perry was supported by reasonable suspicion.  "'[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity

---

[7]Officer Huber also asked Perry that he "come here," but that was after Officer Huber requested, obtained, and kept Perry's driver's license.  This is not entirely analogous to *Florida v. Royer*, 460 U.S. 491 (1983), because Officer Huber did not ask Perry to accompany her to any specific area at the time of the initial seizure.  Nonetheless, we do not consider this distinction detrimental to our application of the Fourth Amendment in this case.

[8]Officer Huber admitted during the suppression hearing that she and Perry have a history. [S.H. Tr. 36] Perry was someone Officer Huber was interested in because of reports that he was selling methamphetamine out of his house. [S.H. Tr. 20]  Officer Huber testified that during her patrol on the day of Perry's arrest, she specifically drove by his house several times for that reason. [S.H. Tr. 20]  She also admitted that she had been attempting to make a case on Perry for two years, and had once before stopped and arrested him. [S.H. Tr. 36, 38]  She admitted that when she started following him, she was hoping he would make a mistake. [S.H. Tr. 42]  She admitted that for the several minutes she followed his vehicle she was "hunting him," intent on pulling him over if he had "not used his turn signal or done something." [S,H, Tr. 43]

[9]Though the State has abandoned the argument that Officer Huber's initial encounter with Perry was not a seizure, but was instead a consensual encounter outside the realm of the Fourth Amendment, the trial court could not have denied Perry's motion to suppress on this basis given the State's evidence.  Officer Huber's stop of Perry plainly went beyond "merely . . . approaching [an] individual[] on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002).  The dissent's rationale to the contrary would render nearly every voluntary relinquishment of identification on request a consensual encounter, notwithstanding indicia as are present here that would lead one to reasonably believe they are not free to leave.

may be afoot . . . ,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 30). The suspicions must be reasonable, "supported by articulable facts that the person stopped is engaged in criminal activity." *Grayson*, 336 S.W.3d at 143 (quoting *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc 1999)). "In evaluating reasonable suspicion, courts must 'determine if the content of the information possessed by the police and its degree of reliability is sufficient to create a "reasonable suspicion" of criminal activity.'" *Id.* (quoting *State v. Berry*, 54 S.W.3d 668, 673 (Mo. App. E.D. 2001)).

The State first argues that Officer Huber had reasonable suspicion that Perry was driving with a suspended driver's license based on her conversation with Officer Maples where Officer Maples stated his belief that Perry had a suspended license. Perry contends that the officers' conversation was not enough to give rise to a reasonable suspicion to initiate a *Terry* stop.

"An officer may receive information through another officer sufficient to authorize either an arrest or a stop." *Franklin*, 841 S.W.2d at 641. In the context of a *Terry* stop, the evidence derived from the stop "is inadmissible if an officer makes the stop on the basis of information provided by another officer or police department if the requesting officer or department lacked reasonable suspicion to make the stop." *Id.* at 642. The State must prove the facts that gave rise to the original suspicion "where the information appears to originate with law enforcement personnel and the state uses the information to justify the stop." *State v. Norfolk*, 966 S.W.2d 364, 367 (Mo. App. E.D. 1998).

12

Officer Huber based her suspicion that Perry was driving with a suspended license on two articulable facts: the report she received two weeks prior from a fellow officer that Perry's driver's license was suspended, and her personal observation of Perry driving. Obviously, however, Officer Huber's bare observation of Perry driving offered nothing to support her suspicion that Perry's license was suspended. The sole and only source of Officer Huber's belief that Perry's license was suspended was Officer Maples' report to that effect two weeks prior. The State was thus obligated to produce evidence persuasively establishing that Officer Maples' suspicion was reasonable because it was supported by specific and articulable facts. Stated another way, we assess the reasonableness of Officer Huber's reliance on the information she received from Officer Maples as if Officer Maples himself had made the investigatory stop of Perry.

The State did not sustain its burden of either production or persuasion on this essential point. The State presented *no* evidence beyond naming Officer Maples as the source of the information which motivated Officer Huber to stop Perry. No explanation was offered to explain how or why Officer Maples came to believe that Perry's driver's license was suspended. In short, there was no evidence that could have permitted the trial court to conclude that Officer Huber's belief that Perry was driving with a suspended license was supported by reasonable suspicion. *Compare Franklin*, 841 S.W.2d at 644-45 (finding a *Terry* stop unsupported by reasonable suspicion where the record was silent about the source of information relayed to the arresting officer) *with State v. Monath*, 42 S.W.3d 644, 649-51 (Mo. App. W.D. 2001) (finding reasonable suspicion where the

13

dispatcher, an intermediary officer, and the seizing officer all testified at the suppression hearing).

The State also argues in its Brief that Officer Huber's *Terry* stop of Perry was supported by a reasonable suspicion that Perry was engaged in the distribution of methamphetamine. This argument is facially inconsistent with the State's evidence admitted during the suppression hearing. Officer Huber testified during the suppression hearing that the ***only*** reason she "came in contact with [Perry was] because [she] believed he was suspended." [SH Tr. 49] Though Officer Huber did testify that she generally possessed the belief that Perry was involved in the distribution of methamphetamine to explain why she had been driving by his house, absolutely no evidence was offered to suggest that Officer Huber stopped Perry to investigate this suspicion, and no evidence was offered to support this suspicion with specific and articulable facts. *See Norfolk*, 966 S.W.2d at 367-68.

The State did not sustain its burden to establish that Officer Huber's *Terry* stop of Perry was supported by reasonable suspicion that Perry was driving with a suspended license or engaged in the distribution of methamphetamine. The evidence seized as a result of the investigatory stop, which Officer Huber testified was still ongoing at the point Perry ran from her, should have been suppressed. *See Norfolk*, 966 S.W.2d at 367-68 (reversing a trial court's overruling of a motion to suppress where the State produced "no evidence regarding the origin of the information on which the officers relied").

During the suppression hearing, the State argued that "probable cause" to arrest existed at the time Perry was arrested, and that Perry was not seized until he was arrested.

14

We have already explained that on appeal, the State has abandoned its argument that a seizure did not occur until the point of Perry's arrest. In addition, the State has abandoned on appeal its argument that the arrest was independently justified by "probable cause." The State no doubt accepts that unless Officer Huber's initial *Terry* stop was lawful, no evidence derived during the unlawful seizure could be used against Perry, including Officer Huber's observations about Perry's behavior, or Perry's decision to run when asked to approach Officer Huber. *Cf. Gant v. State*, 211 S.W.3d 655, 659 (Mo. App. W.D. 2007) ("Facts, which would tend to show the defendant is guilty of a crime discovered after the arrest, cannot be used to bolster an insufficient prior showing of probable cause.").

Officer Huber testified during the suppression hearing that Perry began acting suspiciously while she was in the midst of radioing dispatch to check the validity of Perry's driver's license, and that her investigation into her suspicion that Perry was driving suspended did not end when he handed her a seemingly valid driver's license. Perry's conduct during the conceded temporal parameters of an unlawful *Terry* stop could not supply a new factual predicate for reasonable suspicion that Perry was engaging in criminal activity. *Cf. Grayson*, 336 S.W.3d at 145-46 (quoting *State v. Slavin*, 944 S.W.2d 314, 317-18 (Mo. App. W.D. 1997)) (stating that a new factual predicate for reasonable suspicion may be found during the period of a ***lawful*** seizure permitting the initial lawful detention to extend beyond the time reasonably necessary to effect its initial purpose); *see also State v. Hicks*, 515 S.W.2d 518, 521 (Mo. 1974) ("After-the-event-justification is not permissible."). Rather, Perry's conduct during the unlawful Terry stop would itself have been fruits of the poisonous tree subject to suppression. *See State v. Miller*, 894 S.W.2d

15

649, 653 n.4 (Mo. banc 1995) (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)) ("[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success.").

Officer Huber's *Terry* stop of Perry was unlawful. The methamphetamine evidence should have been excluded as the fruit of a Fourth Amendment violation. *See Miller*, 894 S.W.2d at 654.

***The Abandonment Doctrine does not Apply to Evidence Derived from an Unlawful Seizure***

The State alternatively argues that regardless of the legality of the *Terry* stop, Perry does not have standing to assert a Fourth Amendment violation because the methamphetamine was abandoned in the fence post on property he did not own. The State relies on *State v. Mosby*, 94 S.W.3d 410, 418 (Mo. App. W.D. 2003), where we held that "[w]here . . . an individual drops, throws, or otherwise discards contraband while being followed or pursued by a police officer, the contraband is deemed to have been abandoned, and Fourth Amendment protections no longer apply."

The State's reliance on *Mosby* is misplaced, as in *Mosby* the defendant had not been unlawfully seized at the time of the abandonment. "The law is well-settled that abandonment will be found only when incriminating evidence has been abandoned voluntarily, and that abandonment is not voluntary if it results from an illegal seizure." *Grayson*, 336 S.W.3d at 151 n.7 (citing *United States v. Stephens*, 206 F.3d 914, 917 (9th Cir. 2000) (holding that "abandonment must be voluntary, and an abandonment that results from [a] Fourth Amendment violation cannot be voluntary"); *United States v. Austin*, 66

16

F.3d 1115, 1118 (10th Cir. 1995) (same); *United States v. Segars*, 31 F.3d 655, 658 (8th Cir. 1994) (holding "abandonment cannot be the product of unlawful police conduct"); *State v. Solt*, 48 S.W.3d 677, 682 (Mo. App. S.D. 2001) (same)).

Because Perry was seized unlawfully, and because the pursuit of Perry began while Perry was still subject to an unlawful seizure, Perry's discarding of the methamphetamine while being pursued by law enforcement cannot be characterized as voluntary abandonment as a matter of law.

Point One on appeal is granted. Perry's conviction and sentence are reversed.

## Point Two

Because Perry's conviction and sentence are reversed in connection with Point One on appeal, Perry's second point on appeal, addressing his sentence, is rendered moot.

## Conclusion

Perry's conviction and sentence for the class C felony of possession of a controlled substance are reversed.[10]

_____
Cynthia L. Martin, Judge

Mitchell, Presiding Judge, dissents in separate opinion

_____

[10]Perry was charged with possession of a controlled substance with the intent to distribute, and was convicted of the lesser included offense of possession of a controlled substance, both of which have as an essential element possession of a controlled substance. The only evidence supporting this essential element is the methamphetamine found in the fence post--evidence which was unlawfully seized and which should have been suppressed, and excluded from evidence at trial. As a result, the State is unable to prove an essential element of the crime with which it charged Perry, warranting reversal without remand. *See State v. King*, 157 S.W.3d 656, 664-65 (Mo. App. W.D. 2004); *State v. Brightwell*, 984 S.W.2d 124, 126 (Mo. App. W.D. 1998).

17

Witt, Judge, joins in the majority opinion



# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | **WD78653** |
| v. | ) | |
| | ) | **OPINION FILED:** |
| | ) | **October 18, 2016** |
| JOSEPH FOUNTAIN PERRY, | ) | |
| | ) | |
| Appellant. | ) | |

### DISSENT

The majority concludes that Perry was seized without reasonable suspicion in violation of the Fourth Amendment and, therefore, the trial court erred in overruling his motion to suppress. While I agree with the majority that Officer Huber lacked any reasonable suspicion to believe that Perry was driving while suspended at the time she first encountered him, I disagree with the majority's conclusion that Perry was seized at any time before he voluntarily turned himself in to Sheriff Cox. In reaching its conclusion, the majority applies the wrong standard for determining whether a seizure has occurred, and upon application of the proper standard, it is evident that, at no time, did Officer Huber effect a seizure implicating the Fourth Amendment. Therefore, I respectfully dissent.

## A. The State's arguments

As the majority recognizes, the State argued below that the "initial encounter was not a seizure, and was instead a consensual encounter that falls outside the realm of the Fourth Amendment seizure." Maj. Op. at 8. "Although the Fourth Amendment prevents police from seizing a person without a reasonable suspicion of criminal activity, the Amendment is not triggered by a consensual encounter between an officer and a private citizen." *U.S. v. Villa-Gonzalez*, 623 F.3d 526, 531 (8th Cir. 2010). But the majority then asserts: "On appeal, the State has abandoned this argument. The State now concedes that the initial encounter between Officer Huber and Perry was a *Terry* stop which was subject to the Fourth Amendment." Maj. Op. at 8 (footnote omitted). I disagree with this characterization of the State's arguments,[1] though ultimately, it does not matter "[b]ecause appellate courts are primarily concerned with the correctness of the result reached by the trial court," and "the judgment will be affirmed if cognizable under any theory." *State v. Onate*, 398 S.W.3d 102, 107 (Mo. App. W.D. 2013) (quoting *State ex rel. Feltz v. Bob Sight Ford, Inc.*, 341 S.W.3d 863, 868 n.3 (Mo. App. W.D. 2011)). And, here, because the trial court's decision overruling Perry's motion to suppress can be affirmed on the ground that there was no seizure, the State's arguments on appeal—to the extent they abandon any claims made below—are of no consequence.

---

[1] The State's primary argument in response to Point I is that Perry lacked standing to raise an alleged Fourth Amendment violation because he abandoned the drugs found in the fence post. In making this argument, the State correctly notes that "[c]ontraband discarded by a subject while fleeing from police is considered abandoned property and no cause to search or seize the contraband is required *if the subject has not been seized*." State's Brief at 15 (citing *California v. Hodari D.*, 499 U.S. 621, 629 (1991)) (emphasis added). The State recognizes that the factual predicate required for its abandonment argument is *the absence of a seizure*. Thus, while the State has not focused on the consensual nature of the encounter in the same way it did below, I do not believe it can be said that the State has *conceded* that a seizure has occurred. And though the State argues that any *Terry* stop was justified by reasonable suspicion, this is plainly an alternative argument to its primary argument that Perry abandoned the drugs.

2

**B. "Seizure" under the Fourth Amendment**

The majority begins its analysis by stating, "A seizure occurs when 'the totality of the circumstances surrounding the incident indicates that a reasonable person would have believed that he was not free to leave.'" Maj. Op. at 8 (quoting *State v. Grayson*, 336 S.W.3d 138, 143 (Mo. banc 2011)). While the objective test is certainly relevant, the United States Supreme Court has held that "it states [only] a *necessary*, but not a *sufficient*, condition for seizure." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *U.S. v. Mendenhall*, 446 U.S. 544, 553 (1980).

The objective test cited by the majority originated in the Supreme Court's decision in *Mendenhall* in response to a claim that the defendant's liberty was restrained through a show of authority. In *Mendenhall*, the defendant argued that she had been seized in violation of the Fourth Amendment when, after disembarking from a plane at an airport, she was approached on the concourse by two DEA agents who identified themselves as federal agents and asked to see her identification and airline ticket. *Id*. at 547-48. The defendant complied, and upon noticing that her license and ticket bore different names, the agents asked the defendant to accompany them to the airport DEA office for further questions. *Id*. at 548. The defendant again complied, and upon their arrival at the office, the agents asked the defendant for consent to search her person and handbag, noting that she had a right to decline. *Id*. The defendant responded, "Go ahead." *Id*. The search revealed several packages of heroin. *Id*. at 549.

3

The Court, relying on its earlier holding in *Terry*, rejected the defendant's claim that she had been seized at any time on the concourse: "The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official." *Id*. at 555. The Court reasoned: "[N]othing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way." *Id*. In reaching this conclusion, the Court held "that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id*. at 554. The Court then noted:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id*. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id*. at 555.

Following the Court's decision in *Mendenhall*, the Court decided *Michigan v. Chesternut*, 486 U.S. 567 (1988), where it was asked to determine what actions constituted a sufficient "show of authority" to effect a seizure for purposes of the Fourth Amendment. In *Chesternut*, officers driving on routine patrol noticed a car pull up to a curb, where a person got out and approached the defendant, who had been standing alone on the corner. *Id*. at 569. When the defendant saw the patrol vehicle, he turned and ran. *Id*. The patrol car followed the defendant "to see where he was going," and once it caught up to him, the patrol car "drove alongside him for a short distance." *Id*. While driving alongside the defendant, the officers watched the defendant discard several

4

packets that he had removed from his pocket. *Id.* One of the officers got out of the car and examined the packets, discovering that they contained pills he believed to be codeine. *Id.* When the defendant noticed the officer looking at the packets, he stopped. *Id.* The officer then arrested him for possession of narcotics. *Id.*

The defendant later argued that he had been seized when the patrol car followed him on the street because the "chase" "necessarily communicate[d] that detention [wa]s intended and imminent"; thus, it was a sufficient show of authority to effect a seizure. *Id.* at 574-75. The Court disagreed, noting that "the police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon [the defendant]'s freedom of movement." *Id.* at 575. The Court relied on the facts that the police did not activate their siren or flashers, did not command the defendant to halt, did not display any weapons, and did not operate their car in an aggressive manner to block the defendant's course or control or direct his movements. *Id.* The Court noted that, "[w]hile the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure." *Id.*

After *Chesternut*, the Court was asked to determine whether a "show of authority" was sufficient to effect a seizure when "the subject does not yield." *Hodari D.*, 499 U.S. at 625-26. In *Hodari D.*, officers on patrol came across four or five youths huddled around a car parked at the curb. *Id.* at 622. Upon noticing the officers' approach, the youths fled. *Id.* at 623. The defendant ran through an alley, with an officer pursuing him on foot. *Id.* The defendant did not initially see the officer pursuing him until the officer was "almost upon him." *Id.* At that point, the defendant tossed away a small rock, later determined to be crack cocaine. *Id.* The officer then tackled the defendant, handcuffed him, and called for assistance. *Id.* The defendant sought to suppress the

crack cocaine as evidence at trial, arguing that he was "seized" at the moment he saw the officer running towards him. *Id*.

The Court indicated, "The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield." *Id*. at 626. The Court held "that it does not," reasoning that:

> [t]he word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. . . . It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure.

*Id*.

The defendant in *Hodari D.* argued that the objective *Mendenhall* test applied, and that, under that test, a reasonable person in his position (faced with a rapidly approaching officer commanding him to stop) would not have felt free to leave. *Id*. at 627. The Court disagreed, suggesting that the *Mendenhall* decision should be read more narrowly:

> [i]n seeking to rely upon that test . . . , [defendant] fails to read it carefully. It says that a person has been seized "only if," not that he has been seized "whenever"; it states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a "show of authority."

*Id*. at 628. The Court concluded that, "assuming that [the officer]'s pursuit in the present case constituted a 'show of authority' enjoining [the defendant] to halt, since [the defendant] did not comply with that injunction he was not seized until he was tackled." *Id*. at 629.

### C. Perry was not seized by Officer Huber

As the Supreme Court has repeatedly held, it is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n.16. There is nothing in the record to indicate that Officer Huber ever laid hands on Perry; thus, if a seizure existed, it could arise only by a "show of

6

authority."  As the Court in *Hodari D.* pointed out, "*Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one:  not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628.  But the Court also noted that satisfaction of the *Mendenhall* test, alone, was insufficient to establish a seizure.  *Id*.  Instead, for a seizure to exist upon a "show of authority," there must also be submission by the citizen to that show of authority.  *Id*. at 626 (holding that, "where [physical force] is absent, *submission* to the assertion of authority" is required to effect a seizure); *see also State v. Shahid*, 813 S.W.2d 38, 40 (Mo. App. E.D. 1991) (recognizing that *Hodari D.* modified the objective *Mendenhall* test so that "'seizure of the person' . . . requires . . . where force is absent, submission to an officer's 'show of authority' to restrain the subject's liberty"); *State v. Gabbert*, 213 S.W.3d 713, 718-19 (Mo. App. W.D. 2007) ("A seizure occurs only when an individual is subject to the application of physical force or voluntarily submits to the assertion of police authority.").

The majority concludes, relying in part on *U.S. v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997), that Officer Huber made a "show of authority" by "following Perry for two to four minutes," "pull[ing] up to [his] parked car," advising him "of a suspected suspended license," and "ask[ing] for a valid driver's license to prove otherwise." Maj. Op. at 9.  Though Perry complied with the request for his license, I disagree with the majority that his action constituted submission to a show of authority, as opposed to cooperation with a request made during a consensual encounter.  "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).  "While most citizens will respond to a police request, the fact that people do so, and do so without being told

7

they are free not to respond, hardly eliminates the consensual nature of the response." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984).[2]

To begin, Officer Huber did not pull Perry over; Perry stopped of his own accord upon reaching his destination (his girlfriend's house). "[I]t does not make sense to blame an officer for interfering with someone's liberty when a person stops of his own accord, particularly when the officer did nothing to effect the stop and did not intend to stop him." *U.S. v. Al Nasser*, 555 F.3d 722, 726 (9th Cir. 2009). Officer Huber testified that she never turned on her lights or siren and never attempted to stop Perry's truck. She indicated that she "didn't perform a traffic stop . . . [b]ecause he didn't violate any traffic laws."

In *Al Nasser*, the Ninth Circuit considered the argument that, "if a reasonable person would think that he was being stopped, then the person is 'seized' within the meaning of the Fourth Amendment, even if the police do not want the person to stop and intended for him to go on about his business without stopping." *Id*. at 725. And the court rejected the very reading of its holding in *Chan-Jimenez* that the majority opinion espouses: "There is language in some decisions[3] that might arguably lend itself to such an interpretation, but we reject it." *Id*. "[In *Chan-Jimenez*, w]e did not characterize [the] officer's following the truck until it stopped as a seizure." *Id*. at 730. Indeed, if following a pedestrian in a police vehicle did not constitute a seizure in *Chesternut*, it is hard to understand why it would constitute a seizure here, where the only distinction is that Perry was in his own vehicle, rather than on foot. "Violation of the Fourth Amendment requires an

---

[2] "Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984). "But if the person refuses to answer and the police take additional steps . . . to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *Id*. at 216-17. Here, Perry voluntarily responded and Officer Huber was not called upon to take any additional steps.

[3] "*See, e.g., United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir.1997)." *U.S. v. Al Nasser*, 555 F.3d 722, 726 (9th Cir. 2009).

8

*intentional* acquisition of physical control." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989) (emphasis added).

Likewise, Officer Huber's request to see Perry's license did not constitute a "show of authority," even when coupled with her asserted belief that his license was suspended, because it was nothing more than a request that carried with it no implication that compliance would be compelled. "It is 'clearly' not a seizure . . . for an officer to approach an individual in a public setting, identify himself as a police officer, and ask the individual to step aside and talk to detectives." *U.S. v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006) (quoting *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984)). "A request to see identification is not a seizure, 'as long as the police do not convey a message that compliance with their request is required.'" *Id*. (quoting *Bostick*, 501 U.S. at 435).

Though the majority is correct in noting that a four-member plurality of the Court, in *Florida v. Royer*, 460 U.S. 491, 501 (1983), believed that "a show of official authority" was present when narcotics agents approached the defendant, asked for identification and travel documents, and advised the defendant "that he was suspected of transporting narcotics," a full majority of the Court has never gone so far. And in a 6-3 decision, nineteen years later, the Court concluded that there is a distinction between an authoritative order or command and a simple request. *U.S. v. Drayton*, 536 U.S. 194, 204 (2002). In *Drayton*, the Court determined that an officer's questioning of individuals—on a stationary bus—did ***not*** suggest that compliance would be compelled, where "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." *Id*.

Similarly, here, Officer Huber testified that she never yelled at Perry, never ordered him to put his hands in the air, never drew her weapon on him, did not block his vehicle in any way, and indicated that, during the encounter, until she saw the drugs, he was free to leave.[4] The record further indicates that her requests for Perry's license were merely requests, rather than commands:

A. . . . I stopped my vehicle on the street, got out and said, "Hey Joe, can I talk to you?"

. . .

Q. What did you say first, exactly?

A. . . . I said, "Joe, do you have a valid driver's license? I believe you're suspended[.]" And he goes, "I'm not suspended." And I said, "Well do you have your driver's license on you and can I see it?" He said, "Sure," and he reached in his back pocket and got it.

In short, Officer Huber never made a "show of authority" to which Perry submitted. When he handed her his license upon her request, he was merely engaging in voluntary cooperation during a consensual encounter.

Once Officer Huber noticed Perry holding a small baggie in a clenched fist, she issued her first command for Perry to "come here for a minute." Though the record does not indicate her tone of voice, assuming this command constituted a show of authority, it still did not result in a seizure because Perry refused to comply. Instead, he advised her that he needed "to get this bike out of the back of [his] truck." When Perry took the bike down with his fist still clenched around the baggie, Officer Huber again commanded, "Joe, come here for a minute." But Perry continued

---

[4] The majority implies that Officer Huber held Perry's license for an inordinate amount of time, stating that "[w]ithout his identification card, a reasonable person is much less likely to believe he can simply terminate a police encounter." Maj. Op. at 11 (quoting *U.S. v. Villa-Gonzalez*, 623 F.3d 526, 533 (8th Cir. 2010)). I disagree with this characterization. In *Villa-Gonzalez*, "there [wa]s no indication that [the officer] ever returned [the defendant]'s identification card," despite the opportunity to have done so. *Id.* Here, on the other hand, Perry began acting suspicious immediately after handing Officer Huber his license, by turning away from Officer Huber, putting his hand in his pocket, pulling out a plastic baggie, and holding it in a clenched fist. Officer Huber had not finished checking his license and, therefore, did not have an opportunity to return it before Perry's suspicious behavior commenced.

10

to ignore her "and kept trying to put distance between" them. Officer Huber followed Perry around to the front of his truck, where he still had his hand clenched, and she demanded a third time for Perry to "come here for a minute." At that point, Perry "threw the bike down and took off running." As Officer Huber was giving chase, she yelled multiple times for Perry to "stop running," but he did not stop until he finally turned himself in to Sheriff Cox. Thus, when Officer Huber did engage in a show of authority, Perry did not submit. And because his earlier voluntary cooperation was merely part of a consensual encounter, at no point did Officer Huber seize Perry. Accordingly, the Fourth Amendment was not implicated, and the trial court committed no error in overruling Perry's motion to suppress.

## Conclusion

Because I believe the majority has applied an improper test for determining whether a seizure occurred, I respectfully dissent.[5] I would affirm the trial court's ruling on Perry's motion to suppress.

Karen King Mitchell, Judge

---

[5] In stating the test for seizure, the majority quotes the Missouri Supreme Court in *State v. Grayson*, 336 S.W.3d 138 (Mo. banc 2011). First it should be noted that there was no question about whether the contact at issue in *Grayson* was consensual or a seizure: "Officer Lambert detained Mr. Grayson by compelling him to pull his vehicle over to the side of the road for questioning. The officer said that Mr. Grayson was not free to leave, and a reasonable person would not feel free to leave once he was pulled over by the police and his license taken." *Grayson*, 336 S.W.3d at 143. In setting out the objective *Mendenhall* test, the *Grayson* court omitted the words "only if" before the reasonable person analysis. *Id.* As noted above, in *Hodari D.* the United States Supreme Court found these words important to understanding the breadth of the objective test articulated in *Mendenhall*. Though I recognize that "[s]tates are free to provide greater protections in their criminal justice system than the Federal Constitution requires," *California v. Ramos*, 463 U.S. 992, 1014 (1983), there is no basis to believe that is what the Missouri Supreme Court was attempting to do in *Grayson*. *Grayson* was quoting *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007), which was in turn quoting *State v. Werner*, 9 S.W.3d 590, 600 (Mo. banc 2000). In *Werner*, the Court quoted *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988), when it held: "In other words, a seizure occurs 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Werner*, 9 S.W.3d at 600.

11